Dennis **SERIO**, Plaintiff,

v.

**JOJO'S BAKERY RESTAURANT,**
Defendant.

No. EV 98–111–C–B/H.

United States District Court,
S.D. Indiana,
Evansville Division.

Feb. 1, 2000.

Craig Goedde, Barber Hamilton & Shoulders, Evansville, IN.

Jeffrey T. Shoulders, Barber Hamilton & Shoulders, Evansville, IN.

Mary Lee Schiff, Ziemer Stayman Weitzel & Shoulders, Evansville, IN.

1. We recognize that defendant operates under the title "jojo's Bakery Restaurant," but for

### ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

BARKER, Chief Judge.

Plaintiff, Dennis Serio ("Serio"), comes before us seeking legal and equitable relief for defendant's alleged violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 et seq. Serio claims that defendant, Jojo's Bakery Restaurant ("Jojo"),[1] improperly denied his entitlement to medical leave by terminating him from his management position shortly after he requested such leave. Both parties have moved for summary judgment. For the reasons discussed below, we *GRANT* Jojo's motion for summary judgment and *DENY* Serio's motion for summary judgment.

### I. Background

Defendant Jojo owns and operates restaurants. Jojo employed Dennis Serio from August 19, 1987, until it terminated his employment on April 27, 1998. *See* Compl. ¶¶ 2–3. In approximately July 1996, Jojo promoted Serio from a General Manager position, which involved his overseeing the operations of one restaurant in Evansville, Indiana, to a District Manager position, which involved his managing five Jojo restaurants. *See* Serio Dep. at 77–79. These five restaurants included store 396 in Evansville, stores 238 and 324 in Indianapolis, and stores 70 and 1306 in St. Louis, Missouri. *Id.* Serio's job responsibilities as a District Manager differed substantially from his role as a General Manager, an understandable fact given his broader authority over the restaurants he managed. *Id.*

On June 9, 1997, as Serio approached completion of his first year as a District Manager, his supervisor, Richard Besgen

simplicity we refer to it simply as "Jojo."

("Besgen"), appraised Serio's performance and completed a written evaluation. Serio received an overall rating of 1.14, with zero reflecting unacceptable performance and three reflecting outstanding performance, ranking his performance slightly above "fair." *See* Serio Dep. at 122–26, Def. Ex. 13. Serio rated "fair" in the categories of sanitation/cleanliness and facilities/maintenance and Besgen counseled him to improve; Besgen also warned under the food cost category that "[w]ild fluctuations are not acceptable and need to improve." *Id.* Besgen shared his concerns about Serio's performance with Jeff Wineman ("Wineman"), Jojo's Human Resources Manager, apparently a common practice at Jojo if a supervisor disciplines or terminates an employee. *See* Serio Dep. at 87; Wineman Dep. at 167. As a human resources employee, Wineman essentially functioned as a consultant regarding such personnel actions, almost always offering advice or recommendations but not serving as the ultimate decision-maker. *See* Wineman Dep. at 22, 57, 68–70, 90.

On September 12, 1997, three months after Serio's performance appraisal, Besgen reiterated his concern about food and labor costs by sending Serio an employee communication memo, or "write-up," stating that those costs were not being met, which was "not acceptable and must change immediately." Serio Dep. at 127, Def. Ex. 14. Besgen again communicated his concern to Wineman. *See* Wineman Dep. at 168.

On October 30, 1997, Besgen issued Serio a second communication memo, this one more ominous in tone. *See* Serio Dep. 129–32, Def. Ex. 15. It warned that Serio immediately must begin completing reports in a timely and accurate fashion and that "[e]xcuses will *no longer* be accepted." *Id.* It also admonished Serio to "follow the direction of his [Regional Director of Operation] with out the excuses, and 'I'll do it my way attitude.' Failure to do this will result in immediate disciplinary action which could lead to the loss of his posi-

tion." *Id.* Besgen communicated the substance of the memo to Wineman. *See* Wineman Dep at 168–69.

On April 1, 1998, Jojo hired Garry Warford ("Warford") as Vice President of Operations. Warford replaced Richard Besgen as Serio's supervisor. *See* Serio Dep. at 81. Warford immediately attempted to improve the operational efficiency of the approximately 90 restaurants under his supervision. *See* Warford Dep. at 10. In early April 1998, Warford began conducting unannounced inspections of Jojo restaurants to assess their operations from a customer's perspective. *Id.* at 10, 11, 12, 13. Warford posed as a customer, never identifying himself to Jojo employees while he self-toured the restaurants. *Id.* at 12, 17, 19.

In April, May and June, he visited restaurants in Arizona, California, Indiana and Missouri in this incognito fashion. In the beginning of April, at some point before April 23 or April 24, Warford visited at least four of the five restaurants under Serio's direction. *Id.* at 19, 21–23, 27, 47. He entered each restaurant as a customer, ordered food, walked around the dining room and rest room, inspected the outside lighting, parking lot, doors, door frames and windows, and examined the conditions of the front counter, bakery case and carpeting. *Id.* at 12–13. Warford concluded that the restaurants under Serio's control generally were dirty, unorganized and "bordering on negligence." Warford Dep. at 17, 31, 64–66.

During the week of April 20, Warford discussed these impressions with Craig Bushey, Jojo's President, Beth Libhart, Vice President of Human Resources, and Wineman (also of human resources). *Id.* at 13, 16–17, 19–20; Wineman Dep. at 55–57, 68–70. Jeff Wineman testified that at some point during that week, but prior to his Thursday evening, April 23, 1998, flight into St. Louis to conduct an internal, sexual harassment investigation at one of restaurants that Serio managed, Warford requested, and Wineman provided, a verbal

report about the contents of Serio's personnel file. *See* Wineman Dep. at 17, 55–56, 168–69. Warford likewise testified that he received information from human resources regarding the contents of Serio's personnel file. *See* Warford Dep. at 20–21, 26–27, 31–32.

Wineman informed Warford of Serio's prior counseling by Richard Besgen, which included two negative communication memos and the less than glowing performance appraisal. *See* Wineman Dep. at 56, 168–69; Warford Dep. at 20. During that conversation, Wineman conveyed his opinion that Serio functioned ineffectively as an operator, that he lacked maturity and that he was a poor performer. *See* Wineman Dep. at 55, 57, 68–69. Wineman recommended to Warford that he terminate Serio's employment. *Id.* at 68–69, 70. Also, since Wineman was about to visit St. Louis to investigate employee complaints of sexual harassment, Warford also learned from human resources that such an investigation was on-going in a restaurant that Serio managed. *See* Warford Dep. at 20–21, 31–33.

On either Thursday, April 23, or Friday, April 24, Warford decided to terminate, or "separate," Serio from his position, based on Warford's personal observations of the operational deficiencies at Serio's restaurants and based on the background information provided by human resources. *See* Warford Dep. at 21–23, 47; Wineman Dep. at 17, 55–57, 68–70, 168–69. Warford communicated his decision to human resources personnel, Beth Libhart and Jeff Wineman, but did not inform Serio of the decision until the following Monday, April 27. *See* Warford Dep. at 22–23. Warford testified that he intended to terminate Serio "face-to-face," which he could not physically accomplish until he flew into the Midwest region. *Id.;* Wineman Dep. at 70–71.

Jeff Wineman flew to St. Louis as planned to conduct his sexual harassment investigation at restaurant #70, even though he knew he would work with Serio while interviewing employees at that loca-

tion and understood that Warford planned to terminate Serio's employment. *See* Wineman Dep. at 45, 55, 57, 68–71, 74. Apparently, Serio previously had planned to meet with Wineman to conduct a joint investigation, as he already had checked into a St. Louis hotel by Thursday evening. *See* Serio Dep. at 182–83.

By all accounts, Wineman and Serio had a long day on Friday, April 24. *See, e.g.,* Wineman Dep. at 52. They met from 8:30 a.m. to 12:30 p.m. at restaurant #70 and interviewed individuals involved in the alleged incidents. *See* Serio Dep. at 166–69. Wineman and Serio substantiated the occurrence of "widespread" sexual harassment, so Serio then left restaurant #70 to begin interviewing potential managers to replace the two managers who soon would be terminated for their roles in the transgressions, eventually returning at approximately 5 p.m. *Id.* As a result of their investigation, Wineman recommended to Serio that he terminate the employment of two managers, Eugene Wall and Mark Williams, and their termination occurred that same day. *Id.* at 166–73; Wineman Dep. at 21–22. Wineman left a voice-mail message for Warford notifying him of both the two "separations" and the unprofessional and inappropriate conduct that occurred at restaurant #70. *See* Wineman Dep. at 42–43.

That evening, from 8 p.m. to 9 or 10 p.m., Serio and Wineman met at restaurant #1306 (also in St. Louis) to discuss the "day's worth of investigation." *Id.* at 180. Wineman agrees that he was committed to preventing sexual harassment at the restaurant and that it was part of his job function to work with Serio to do any follow-up work to prevent it from continuing. *Id.* at 45, 74. Their meeting also involved some collateral matters, such as Wineman's recommendation to reinstate an assistant manager (which Serio did), and Wineman's concern that Serio was exposing the company to litigation by allowing a salaried employee, John Dowell, to function primarily in an hourly capacity

without paying him overtime. *See* Wineman Dep. at 34–36. (Wineman believed that the issue could be resolved by either training Dowell to function in a full-time managerial capacity or arranging for him to function in an hourly capacity receiving an hourly rate, but Serio disagreed and did not perceive a problem.)

After the conclusion of their evening meeting, Serio returned to restaurant # 70 for approximately one hour, after which he went to his hotel, checked out and drove home to Evansville, where he arrived at approximately 3 a.m. *See* Serio Dep. at 182–85. Serio did not go directly to sleep, however. He "stayed up crying with his wife" regarding the day's events; he was "nauseous," "severely depressed, stressed," and "emotionally distraught" because of the sexual harassment investigation at restaurant # 70 and the termination of two employees. *Id.* at 184–85. It is unclear from the record if Serio sensed that he might be the next manager to lose his job.

Serio eventually slept for four hours that Saturday morning, April 25, 1998, awoke, and decided to visit the emergency room at St. Mary's Hospital, complaining of stress, some shortness of breath and some chest tightening. *Id.* at 188, 191, 247–49, Def. Exs. 24, 32. The treating physician confirmed that Serio had not suffered a heart attack and determined (in his opinion) that Serio did not have a serious medical illness. *Id.* The physician diagnosed him with a depressive disorder, referring him to the hospital's stress center. *Id.* At approximately 10 p.m. that evening, Serio voluntarily requested, and received, a discharge from the stress center. *Id.* at 209.

At some point on that Saturday, in the throes of his hospital visit, Serio telephoned Wineman and left a voice-mail message that he had been admitted to St. Mary's stress center and needed some time off work. *See* Wineman Dep. at 47–

48; Serio Dep. at 190. At approximately 10:30 p.m., after his discharge, Serio also contacted employees at restaurants he managed to check-in on operations. The next day, Sunday, April 26, 1998, Wineman and Serio talked by telephone, and Serio explained that he had been voluntarily discharged from the stress center the previous night and needed time off work. Wineman responded to the request by referring Serio to Warford, Serio's supervisor, although Serio stated that he did not know how to reach Warford. Serio believed that Wineman and Warford then talked, after which Wineman telephoned Serio and a second discussion ensued. According to Serio, Wineman asked him to meet Wineman and Warford in St. Louis or asked him to meet them at one of the restaurants, after which Serio claims to have stated that he was very sick and could not meet them. *See* Serio Dep. at 197. Wineman recalls that on either Saturday, April 25, or Sunday, April 26, he told Serio that he and Warford wanted to meet with him at restaurant # 70 on Monday morning, April 27.[2] At some point on Sunday, Wineman then confirmed with Warford that the meeting had been scheduled. *See* Wineman Dep. at 74–76.

Serio claims that about five minutes after he and Wineman completed their second discussion, Warford telephoned him at this home and stated that he understood that Serio was sick and not feeling well, although Warford did not know that Serio had checked into St. Mary's hospital. *See* Serio Dep. at 197–98; Warford Dep. at 46. (Warford and Serio met on only one prior occasion in Dallas and apparently had never spoken by telephone prior to this occasion.) Serio contends that he requested time off work, with Warford responding, "that's fine," and requesting Serio to provide a doctor's excuse and to "let me know when you're coming back to work and we'll tour the area together." *Id.* Warford recalls that he had a conversation with Serio

---

2. For purposes of summary judgment, we assume that this conversation occurred on Sunday and that its content comports with the impressions of Serio, the non-movant.

on Sunday and that Serio said he was sick and not feeling well, but Warford claims he still asked Serio to meet him at the St. Louis restaurant on Monday. *See* Warford Dep. at 25, 45. Serio denies that Warford mentioned anything about a Monday meeting or requested his attendance (he does admit that Wineman apprised him of it minutes earlier), an alleged fact that we presume as true in considering Jojo's summary judgment motion. *See* Serio Dep. at 198.[3]

Under the impression that they were meeting with Serio at restaurant # 70 on Monday morning to terminate his employment, Wineman and Warford flew to St. Louis. Wineman left Phoenix on Sunday evening and Warford also left from an unspecified location that night. The following morning, while waiting at restaurant # 70, Wineman again informed Warford that he had instructed or asked Serio to be at the meeting by either 10 or 11 a.m. *See* Warford Dep. at 45–46. Not surprisingly, Serio never showed, as he believed that he was not expected to attend the meeting in light of his condition. Although Warford preferred not to release Serio over the telephone, he consulted Wineman, who in turn called Beth Libhart (Vice–President of Human Resources), to solicit input on whether termination by that means was appropriate under the circumstances. Having received support from both sources to proceed with the separation by telephone, Warford elected not to further postpone the termination

decision he had made on the previous Thursday or Friday. *See* Warford Dep. at 46–48; Wineman Dep. at 77, 90–92. Warford called Serio from restaurant # 70 on Monday morning and informed him that his employment was being terminated because his restaurants were dirty. *See* Warford Dep. at 30–31, 45–48, 64–66; Wineman Dep. at 91–92. Serio testified that Warford stated, "I just got here in St. Louis. Your restaurant is deplorable. You're terminated." Serio Dep. at 200.

On Monday afternoon, Serio visited a psychiatrist, Dr. Lado, who conducted a psychiatric evaluation, prescribed medication for depression and a panic disorder, scheduled Serio for follow-up treatment, and provided Serio with a "return to work slip" (even though Serio had been terminated), allowing Serio to return to work, without restrictions, on the following Monday, May 4, 1998. *See* Serio Dep. at 244, 255, 267, Def. Ex. 38; Lado Aff. The next day, Tuesday, April 28, 1998, Serio visited a family physician. Serio also canceled the follow-up appointment with Dr. Lado, apparently because Serio's insurance carrier would not cover Dr. Lado's services. *See* Serio Dep. at 244, 252. On either Tuesday or Wednesday of that week, Serio spoke to either Wineman or Libhart, although he cannot recall the substance of the conversation, after which he drove to his former Evansville office, returned his keys and company vehicle and collected his personal belongings. *Id.* at 203–04, 284–85. On May 8, 1998, Serio's counsel contacted Jojo

---

3. In addition to these three phone conversations on Sunday and despite his anxiety and depression, Serio managed to fax a host of documents to various individuals, including Wineman. At approximately noon on Sunday, Serio faxed Wineman his "official request" for leave due to "mental stress." Serio Dep. at 213, Def. Ex. 26. Serio copied Warford on the fax but never actually mailed or faxed a copy to Warford, nor did Warford ever see a copy. *See* Warford Dep. at 25–26; Serio Dep. at 196, 210. At approximately 3 p.m., Serio faxed a document to an Evansville number, which likely related to information needed by an employee that Serio managed. *See* Serio Dep. at 213–216, 234–35. Wine-

man's human resources duties required him to follow-up on the issues raised on Friday, including both finding managers to fill the just-vacated positions at restaurant # 70 and faxing Serio documentation of Wineman's concern that John Dowell's hourly status risked exposing Jojo to litigation. In recognition that Wineman needed to continue searching for restaurant # 70 managers, Serio faxed seven and ten page documents to Wineman at approximately 8 p.m., which apparently were Serio's notes taken during the manager interviews he conducted two days earlier on Friday afternoon in St. Louis. *See* Serio Dep. at 214–15.

regarding his termination. Serio apparently did not receive any further treatment from a health care provider until June 29, 1998, when he visited the Southwestern Indiana Mental Health Center for depression and anxiety. *Id.* at 256, Def. Ex. 29.

## II. Discussion

### A. Summary Judgment Standards

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Eiland v. Trinity Hosp.,* 150 F.3d 747, 750 (7th Cir.1998). However, neither the mere existence of some alleged factual dispute between the parties, *Baulos v. Roadway Express, Inc.,* 139 F.3d 1147, 1152 (7th Cir.1998), nor the existence of "some metaphysical doubt as to the material facts," *Fairchild v. Forma Scientific, Inc.,* 147 F.3d 567, 571 (7th Cir.1998) (internal quotations omitted) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)), is sufficient to defeat a motion for summary judgment.

In considering a motion for summary judgment, any inferences drawn from the facts must be viewed in the light most favorable to the non-moving party, but only reasonable inferences need be made. *See Mills v. Health Care Serv. Corp.,* 171 F.3d 450, 459–60 (7th Cir.1999). If genuine doubts remain, and a reasonable factfinder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enters., Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg,* 870

F.2d 1327, 1330 (7th Cir.1989). Nevertheless, only issues of fact that could affect the outcome of a case are "genuine" such that they may save a case from summary judgment: *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 178 (7th Cir.1994). If it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but also required. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Herman v. City of Chicago,* 870 F.2d 400, 404 (7th Cir.1989).

### B. FMLA "Entitlement" Claim

The Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq., establishes two categories of broad protections for employees. First, the FMLA contains prescriptive protections that are expressed as substantive statutory rights. *See King v. Preferred Tech. Group,* 166 F.3d 887, 891 (7th Cir.1999). The Act provides eligible employees of a covered employer the right to take unpaid leave for a period of up to twelve work weeks in any twelve-month period for a serious health condition as defined by the Act. *Id.; see* 29 U.S.C. § 2612(a)(1). After the period of qualified leave expires, the employee is entitled to be reinstated to the former position or an equivalent one with the same benefits and terms of employment that existed prior to the exercise of the leave. *Id.; Haefling v. United Parcel Serv., Inc.,* 169 F.3d 494, 498 (7th Cir.1999). To ensure the availability of these guarantees, the FMLA declares it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided." 29 U.S.C. § 2615(a)(1); *King,* 166 F.3d at 891. An employee alleging a deprivation of these substantive guarantees must demonstrate by a preponderance of the evidence only his/her entitlement to the disputed leave. In such cases, the intent of the employer is immaterial. *See King,* 166 F.3d at 891 (*citing*

*Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711, 713 (7th Cir.1997)). A claim brought under this substantive right provision of the FMLA is known as an "entitlement claim."

Second, the FMLA contains an anti-discrimination component similar to Title VII, which prohibits an employer from discriminating or retaliating against an employee who requests or takes medical leave pursuant to the statute. *Id.* Specifically, "[a]n employer is prohibited from discriminating against employees ... who have used FMLA leave." 29 C.F.R. § 825.220(c). Under such a "discrimination/retaliation claim" the intent of the employer is relevant and the burden-shifting apparatus of McDonnell Douglas applies with full force. *See King*, 166 F.3d at 891 (*quoting Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir.1998) ("In such a case, the employer's motive is relevant, and the issue is whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason.")).

In this case, Serio advances an "entitlement" claim under the FMLA, expressly disavowing any claim that Jojo either discriminated or retaliated against him for requesting leave.[4] He claims that Jojo interfered with the exercise of his FMLA right to take medical leave. Specifically, Serio contends that by ending his employment, Jojo effectively denied his FMLA request.

An important caveat operates to qualify the protections afforded by the FMLA, and one that the parties failed to identify in their summary judgment submissions. An employee who requests or takes protected leave under the FMLA is not entitled to any greater rights or benefits than he would be entitled to had he not requested or taken leave. *See Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 680–81 (7th Cir.1997); *Clay v. City of*

*Chicago Dep't of Health*, 143 F.3d 1092, 1094 (7th Cir.1998). Therefore, an employer is entitled to dismiss an employee for any lawful reason at any time, whether before, during, or after an employee requests or takes leave pursuant to the FMLA, as long as the employer does not discriminate or retaliate against the employee for requesting or taking such leave. *Id.; see* 29 C.F.R. § 825.216(a) ("An employee has no greater right to reinstatement or other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period."); *Stoops v. One Call Communications, Inc.*, 141 F.3d 309, 311 (7th Cir.1998) (accepting as "legitimate and controlling" the Secretary of Labor's FMLA regulations since, like in the case at bar, neither party challenged their propriety).

In this case, it is undisputed that Serio's supervisor, Warford, terminated Serio's employment because his restaurants were managed poorly, evidenced by Warford's personal observation of dirty restaurants and by negative information in Serio's personnel file. Serio never impugns Warford's motivation for this termination or attempts to do so.

Serio also forfeited an opportunity to question Warford's explanation for the termination when he expressly and repeatedly disavowed any retaliation or discrimination claim in his summary judgment submissions. Indeed, we are not alone in observing that a plaintiff's refusal to allege a FMLA retaliation claim may doom an entitlement claim based on the employer's alleged improper termination of an employee on medical leave. *See, e.g., Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1262 (10th Cir.1998) (finding that even though employer fired plaintiff three days after she requested and took medical leave, dismissal comported

---

**4.** After the close of discovery and during the pendency of the fully briefed summary judgment motions now before us, Serio moved to amend his complaint to include a retaliation claim under the FMLA. As explained in the discussion below, that motion is denied.

with the FMLA; plaintiff refused to allege retaliation claim and employer cited plaintiff's insubordination and disruptive behavior the day before she took medical leave as one valid ground for termination).

■ Therefore, in regard to the FMLA "entitlement" claim, Jojo has demonstrated that poor performance accounted for Serio's dismissal and that Serio is "entitled" to nothing, as Jojo's ignoring Serio's poor performance and deferring his termination simply because he requested medical leave would vest Serio with greater rights and benefits than he would have enjoyed had he continued working without requesting such leave. In other words, Jojo lawfully could have terminated Serio for poor performance either before, during, or after his request for medical leave without interference from the FMLA. *See Kariotis*, 131 F.3d at 681 (finding that employer who refused to reinstate employee on medical leave complied with FMLA; since the employer could have fired plaintiff if it had an "honest suspicion" that plaintiff committed fraud while on duty, it could fire her if it had an honest suspicion that she committed fraud while on medical leave); *cf. Clay*, 143 F.3d at 1094 (affirming district court's dismissal of plaintiff's FMLA claim; employer complied with FMLA even though it refused to reinstate plaintiff after she returned from medical leave and eventually terminated her, as employer could have discharged her for poor performance even if she had not taken medical leave); *McCown v. UOP, Inc.*, No. 94 C 2179, 1995 WL 519818, at *7 (N.D.Ill. Aug. 30, 1995) ("The FMLA is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave.")

Serio does suggest, however, that since Warford (according to Serio) acceded to his request for medical leave during their conversation on Sunday, April 26, 1998, and seemed to acknowledge his returning to Jojo at some point in the future, Warford had either had not decided to terminate him for poor performance prior to

Sunday, or perhaps that he had changed his mind by the time they spoke on Sunday. Based on that conversation, it may be a reasonable inference that, on Sunday, Warford accepted Serio's medical leave request (indeed, he may have been required by the FMLA to do so) and that he actually considered allowing Serio to return after leave despite his performance problems. However, we are unwilling to draw the next unreasonable inference in Serio's favor (especially when Serio never advances the argument) that, on Monday morning, Warford dismissed Serio for some reason other than because of his dissatisfaction with Serio's managerial performance and the dirty restaurants he personally observed.

On the contrary, both Warford and Wineman testified that Warford decided to release Serio on the previous Thursday or Friday for dirty restaurants and for previously documented operational deficiencies. The undisputed evidence demonstrates that Warford communicated this decision to at least two human resources employees, Wineman and Beth Libhart, prior to Serio's request for medical leave. The undisputed evidence also reveals that on the heels of Warford's inspections of restaurants that "bordered on negligence," Warford learned that Serio had received two previous write-ups and a pedestrian performance appraisal.

Warford vividly recalled his inspections and recounted the conditions at one of the typical restaurants under Serio's management:

> [Restaurant # 70], the same thing. There were lights out in the parking lot. The crew had no name tags. Their uniforms looked old and shabby. The men's room was not only dirty but there was an odor coming out of it that was offensive. The stainless steel was not clean and sparkling. The front counter was not clean. The carpets were not clean. There were lights out in the dining room. The bakery case had fingerprints all over the front of it where

we are trying to merchandise the baked goods. The back room was unorganized. There was—there were things everywhere. And, again, the floors were wet and greasy. The office was—there were papers and notices hanging all over the doors, billboards;—just very, very unorganized.

Warford Dep. at 65.

Serio fails to offer any deposition testimony from Warford, Wineman or Libhart (or evidence from any source for that matter), that these various events and communications did not transpire, nor does Serio point to any evidence suggesting some conspiratorial objective between any of these individuals to fabricate the poor performance justification for Serio's dismissal. Simply put, Serio never quarrels with his poor managerial performance or disputes that, on Monday, April 27, this factor was the reason Warford terminated his employment.[5] Accordingly, under the facts of this case, the FMLA never engages to offer Serio relief for his dismissal; Jojo's motion for summary judgment is *GRANTED*, while Serio's motion for summary judgment is *DENIED*.[6]

### C. Motion To Amend Complaint

Serio moves to amend his complaint to add a FMLA retaliation claim. We deny that motion for a litany of reasons. Under Rule 15(a) of the Federal Rules of Civil Procedure, the district court may grant leave to amend pleadings, with leave "freely given when justice so requires." FED. R. CIV. P. 15(a). However, leave to amend is "inappropriate where there is undue delay, bad faith, dilatory motive on

the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of the amendment." *Feldman v. American Memorial Life Ins. Co.*, 196 F.3d 783, 793 (7th Cir.1999) (internal quotations and citations omitted) (affirming district court's denial of motion to amend on grounds of undue delay and prejudice; plaintiff filed motion six months after close of discovery and three months after district court had set briefing schedule for summary judgment).

▮ A district court's decision to deny a motion to amend a complaint is reviewed for an abuse of discretion. *See Hindo v. University of Health Sciences/The Chicago Med. Sch.*, 65 F.3d 608, 614–15 (7th Cir. 1995) (affirming district court's denial of motion to amend since plaintiff filed the motion four days after the close of discovery and during the pendency of a motion to dismiss; recognizing the "litany of instances in which [the Seventh Circuit has] affirmed a district court's denial of leave to amend a complaint where discovery has ended and a motion is pending for dismissal of the count or for summary judgment"). "Moreover, the denial will be overturned only if there was no justifying reason for it." *See. Sanders v. Venture Stores, Inc.*, 56 F.3d 771, 773 (7th Cir.1995) (internal quotations and citations omitted).

▮ In this case, Serio seeks to amend his complaint well over a year after he filed his original complaint, over six months after the close of discovery, and over four months after the parties have filed their fully briefed summary judgment

---

**5.** Also, the fact that Wineman continued to interact with Serio prior to his Monday dismissal does not alter our conclusion. It is undisputed that Wineman recommended Serio's dismissal prior to his request for medical leave. Wineman served in a human resources capacity and testified that he nonetheless was obligated to follow-up on personnel issues as long as Serio still worked for Jojo, and especially so when those matters involved sensitive legal issues such as a sexual harassment investigation and the company's potential legal exposure for violations of overtime

laws. In any event, although Wineman served in an advisory capacity, he was not the ultimate decision-maker regarding Serio's employment, so he was required to work with Serio even if he considered Serio a poor manager. Moreover, as we have said, Serio never challenges that his dismissal was due to his performance.

**6.** In light of this ruling, we express no opinion on whether Serio suffered from a "serious health condition" within the meaning of the FMLA.

motions. The undue delay of these proceedings, coupled with the undue prejudice that Jojo would incur from re-litigating the dispute on this newly and delinquently advanced basis, alone justify our denial of Serio's motion. *See Sanders*, 56 F.3d at 774 ("This conclusion [affirming denial of motion to amend] is supported by our case law uniformly advising that a plaintiff's leave to amend, when filed after discovery has been closed and after a defendant's motion for summary judgment has been filed, is considered unduly delayed and prejudicial."); *Hindo*, 65 F.3d at 614–15. But we find a further, more compelling reason not to exercise our discretion on Serio's behalf.

Serio expressly disavowed a retaliation theory throughout the course of its summary judgment submissions. Serio's original complaint failed to mention any claim that Jojo terminated him in retaliation for his alleged request for medical leave. Nonetheless, Jojo, noting that Serio's summary judgment submissions may have conflated the two types of claims under the FMLA (entitlement vs. discrimination/retaliation claims), repeatedly questioned whether Serio attempted to assert a retaliation claim.

Instead of adopting a retaliation theory, Serio eschewed it—and not just once during the course of its numerous summary judgment submissions. On March 22, 1999, Jojo filed a motion for summary judgment, in which it clearly identified the two types of FMLA protections: (1) substantive entitlement to twelve weeks of medical leave, where the employer's intent is immaterial, and (2) protections against discrimination and retaliation for exercising the right to medical leave, in which the intent of the employer is relevant. *See* Jojo's Br. Supp. Summ. J. at 7–8. Jojo stated that the former protections were at issue in this case, with Serio claiming that he was not afforded his substantive right under the FMLA to take the medical leave to which he was entitled. Jojo's central argument concerned whether Serio suffered from a "serious medical condition" under the FMLA.

In response to Jojo's motion, Serio filed his own motion for summary judgment on April 5, 1999. In that motion, Serio twice expressly characterized his argument as an "entitlement" claim under the FMLA: "In an employee's FMLA action based on a deprivation of the right to take medical leave, the employee must demonstrate only his entitlement to the disputed leave. In such cases, the intent of the employer is immaterial. Any employer who interferes with ... the exercise of any right to leave under the FMLA is strictly liable, regardless of the intent of its actions." Pl.'s Br. Opp. Def.'s Mot. Summ. J. & Supp. Pl.'s Cross–Motion Summ. J. at 1, 12, 21. Like Jojo, Serio concentrated on whether he suffered from a "serious medical condition" under the FMLA, an issue that could be dispositive of either an entitlement or discrimination/retaliation claim under the FMLA.

On April 27, 1999, Jojo replied to Serio's motion for summary judgment, continuing the "serious medical condition" debate, but noting that Serio may have combined the two types of FMLA claims at one point in its brief. Thus, Jojo took pains to question whether Serio intended to assert any claims based on the discrimination/retaliation arm of the FMLA. On May 4, 1999, Serio filed his "Surreply" to Jojo's response, in which he actually criticized Jojo for questioning whether Serio attempted to assert a retaliation claim: "jojo's also takes a 180" turn with regard to the law applicable to this case. In its original brief, jojo's recognized that "this action is an 'entitlement' claim under the FMLA. Now, after Serio moved for summary judgment, jojo's argues that this action is a 'retaliation' claim." Pl.'s Surreply to Def.'s Reply at 2 n. 1.

On May 10, 1999, Jojo filed its third substantive summary judgment submission, a response to Serio's motion for summary judgment. Jojo concluded that Serio, in fact, only had asserted an entitlement claim, but suggested that perhaps Serio initially confused the two types of claims

available under the FMLA. *See* Def.'s Resp. Br. Opp. Pl.'s Mot. Summ. J. at 16. Jojo pointed out that Serio had failed to address the prima facie elements of a retaliation claim in any event, including addressing any causal connection between his termination and the alleged request for medical leave. *Id.* at 16–17, 21–22. Finally, Serio filed his third summary judgment submission, stating that he had not confused the two types of FMLA recovery theories, and that his "complaint in this action is an 'entitlement' claim and Jojo's intent in terminating Serio is irrelevant." Pl.'s Reply Br. Supp. Summ. J. at 4, 13 n. 2. Serio again expressly disavowed any retaliation claim, even accusing Jojo of attempting "to divert this Court's attention to the law regarding retaliation because Jojo's apparently recognizes that Serio is entitled to summary judgment on his entitlement claim." *Id.* at 5, 1–2.

As this extensive recitation reveals, Serio not only had at least three meaningful opportunities (at summary judgment *alone*) to assert a retaliation claim, but Serio also was apprised of the retaliation theory (by the *defendant* no less) at each stage of the lengthy summary judgment process. Indeed, Jojo states that the very reason it attempted to discern the nature of the FMLA claim was "to make absolutely sure it did not have to conduct discovery or do any other type of work on defending against a retaliation claim. And now, given the turnover in jojos personnel, it would be virtually impossible for jojos to conduct and complete thorough discovery and present a defense to a retaliation claim absent great expense." Def.'s Objection to Pl.'s Mot. to Amend at 9–10. Despite these chances to capitalize on the retaliation theory, Serio declined to do so, instead opting to entrench his claim behind an entitlement theory to the exclusion of all else.[7] Having repeatedly staked out a position after the close of discovery and throughout

the summary judgment process, Serio has painted himself into a corner. If ever there was a case where "justice so requires" a *denial* of a motion to amend, this is it; we would turn Rule 15(a) on its head if we held otherwise. Accordingly, Serio's motion to amend his complaint to add a retaliation claim is *DENIED*.

### III. Conclusion

For the reasons discussed, we *GRANT* Jojo's motion for summary judgment and *DENY* Serio's motion for summary judgment. Also, we *DENY* Serio's motion to amend the complaint.[8]

### JUDGMENT

As explained in the accompanying Entry in the above-named cause, judgment is hereby entered in favor of Defendant, Jojo's Bakery Restaurant, and against Plaintiff, Dennis Serio.

---

7. Even when we allowed the parties a final opportunity to file supplemental summary judgment briefs, Serio failed to raise a retaliation claim and request an amendment to his complaint.

8. Jojo's motion to strike and its motion for order to set case for trial by the court are *DENIED* as moot.