**Rolland D. JINES, Plaintiff,**

v.

**EVANS MOTORS, INC. d/b/a/ Evans Toyota Isuzu Suzuki, Defendant.**

**No. 1:02CV418.**

United States District Court, N.D. Indiana, Fort Wayne Division.

Oct. 29, 2003.

Christopher C Myers, Christopher Myers and Associates, Fort Wayne, IN, Shane C Mulholland, Burt Blee Dixon Sutton and Bloom, Fort Wayne, IN, for Rolland D Jines, Plaintiff.

Lori W Jansen, Mark C Chambers, Haller & Colvin PC, Fort Wayne, IN, for Evans Motors Inc, Defendant.

John F Lyons, Barrett and McNagny, Fort Wayne, IN, Mediator, pro se.

## MEMORANDUM OF DECISION AND ORDER

COSBEY, United States Magistrate Judge.

### I.  INTRODUCTION

The Plaintiff, Rolland D. Jines ("Jines"), is suing Evans Motors, Inc. d/b/a Evans Toyota Isuzu Suzuki ("Evans") because he contends his termination by Evans was in retaliation for exercising his rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.* and in violation of his substantive FMLA rights. In response, Evans has also filed a counterclaim seeking to be reimbursed for Jines's share of the medical insurance premiums Evans paid while, according to Evans, Jines was on FMLA leave.

This matter is before the Court [1] on the fully briefed Motions for Summary Judgment filed by Evans [2] and is supported by the depositions of Jines (Jines Dep. p. ___), Lenny Martin ("Martin"), Evans's parts and service director (Martin Dep. p. ___), Scott Lewis ("Lewis"), Evans's parts manager (Lewis Dep. p. ___), as well as the affidavits of Michelle Sterk ("Sterk"), Evans's office manager (Sterk Aff. ¶ ___), and Martin (Martin Aff. ¶ ___). In addition, Jines also submitted an affidavit (Jines Aff. ¶ ___).

Essentially, this action revolves around the disputed factual question of when Jines was terminated. As the precise termination date involves a genuine issue of material fact which the Court cannot resolve at this stage, each of Evans's motions for summary judgment must be denied.

### II.  FACTUAL BACKGROUND [3]

Jines began working for Evans as a parts driver in July 1999. Jines Dep. p. 6. That position involved picking up parts at a depot, bringing those parts back to Evans, unloading them and then delivering them to body shops and car dealers in Fort Wayne and in Northern Indiana and

---

1.  The matter is a consented case to the Magistrate Judge.  *See* 28 U.S.C. § 636.

2.  Evans filed a motion for summary judgment on Jines's claims, as well as on its counterclaim, on September 8, 2003, and a supplemental motion for summary judgment concerning only Jines's claim against it for conversion of his vacation pay on September 9, 2003. Both motions will be addressed *infra.*

3.  As Jines is the party opposing summary judgment, the facts are construed in the light most favorable to him.  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir.2003).

Ohio. *Id.* at 6–8. Jines contends that he had a partner to help him, especially when heavy lifting was involved.[4] *Id.* at 6–7. Thus, Jines contends that the heaviest part he had to lift alone was a Camry hood weighing forty to fifty pounds. *Id.* at 7.

On September 2, 2002, Jines was thrown from a golf cart, suffering a broken clavicle. *Id.* at 9. Jines told Martin in person on September 3 that he needed at least two weeks off. *Id.* at 10. Martin told Jines to "[g]et the shoulder better" and to "check back in" once he received a diagnosis from an orthopedist. *Id.* At that time, Jines, who is right-handed, was wearing a sling on his left arm. *Id.* at p. 11. The Court assumes that this was the beginning of Jines's FMLA leave.

On September 13, 2002, Jines saw Dr. Jerry Mackel, an orthopedist. *Id.* Dr. Mackel prohibited Jines from working for at least six weeks. *Id.* Furthermore, Jines was instructed to wear a clavicle strap and sling and was not permitted to lift over twenty pounds at all or to lift any amount of weight over his head. *Id.*

Jines then went into Evans on about September 15, speaking initially to Jim Armstrong ("Armstrong"), an office manager. *Id.* at 12. Armstrong told Jines that he would "see if maybe there was a position open [for Jines], maybe answering phones, something part time just to do something." *Id.* Following that conversation, Jines met with Martin and Lewis in Martin's office. *Id.* At that meeting, Jines informed them that he needed at least six more weeks off. *Id.* at 15. Martin told Jines that his job was secure and "stable as long as [you are] under doctor's care." *Id.* at 13. Later that day Martin also informed Jines of his eligibility for disability insurance. *Id.*

The parties had no further substantive contact until October 24, when Jines called Lewis to check on the veracity of a voice message left for Jines by Scott Lahrman ("Lahrman"), a former parts manager at Evans,[5] in which Lahrman told Jines that his position had been filled.[6] *Id.* at 16. When Jines called Lewis and expressed anger about his position being filled, Lewis stated that he "was tired of losing money" and "had to fill the position." *Id.* at 17. Jines contends that Lewis told him that he did not need to hold the position open because Jines's accident was not work-related. *Id.* After a heated discussion, Lewis told Jines that "Your [Jines's] job is done, terminated, end of story."[7] *Id.* at 18. After an hour and a half, Jines called Lewis again and asked if he was still terminated, and when Lewis responded affirmatively, Jines said "Then have the termination papers ready and have my stuff

---

4. Evans asserts that Jines did not have a partner per se. Rather, Evans contends that another parts driver, Woodcox, occasionally stocked shelves with Jines but that Jines and Woodcox "did not work together when they delivered parts. Each of them had his own parts delivery truck and made his own individual deliveries to different body shops, etc." Martin Aff. ¶ 5.

5. Lahrman quit working for Evans the day Jines was injured. Martin Dep. p. 24.

6. While unclear of the exact date, Martin states that Jines's position was filled sometime near the end of October, 2002, although no one from Evans informed Jines of that

action. Martin Dep. p. 18. On the other hand, Lewis says that he personally hired Jines's replacement in mid-October. Lewis Dep. p. 4. Regardless of the date, Evans claims that a replacement was necessary because they had become woefully understaffed when two other employees left with Lahrman. Martin Dep. p. 25–26.

7. Although Lewis agrees that he probably told Jines that he was finished, he claims that the statement had no practical effect because he "had no official impact with the company until the first of November.... I was an outside consultant until that date." Lewis Dep. p. 8.

boxed up, and I'll be in and get them." *Id.* at 19.

The next day, October 25, Jines met with Armstrong and Martin. *Id.* Prior to Martin's arrival, Jines and Armstrong had a discussion about the FMLA, which Armstrong said he had not heard of, so Jines presented Armstrong with some papers concerning the FMLA which he had copied from the internet.[8] *Id.* at 20. When Martin entered the room he placed some termination papers on a desk, but Jines refused to sign them because he had not consulted counsel and was unsure the effect the papers would have on his FMLA rights. *Id.* The three then discussed the FMLA and Martin offered the opinion that Jines's broken shoulder was not a serious health problem, meaning, at least to Martin, that Jines was not eligible for FMLA benefits. *Id.* According to Jines, Martin also stated that Evans did not need a reason to fire Jines because "Indiana is a right to hire, right to fire state...." *Id.* at 21.[9]

Jines then opined that he was entitled to a position of equal pay under the FMLA, to which Martin stated that he had a service porter position available but at a lower salary than Jines's driver position. *Id.* at 21. Armstrong then told Jines that Evans needed to contact its attorneys to find out "if this is all legal" and that Evans would follow the law and get back with him. *Id.* at 21–22. Jines contends that Evans has not called him since that meeting. *Id.* at 22. According to Jines, there was no discussion at that October 25 meeting about his medical condition nor how long he would need to be off work.[10] *Id.*

Dr. Mackel's notes from October 25 state that Jines "is more comfortable but still has tenderness, unable to fully lift the shoulder without slight pain, but has full range of motion." *Id.* at 27. Dr. Mackel also opined that Jines could do no overhead lifting and could lift no more than twenty pounds on his injured side. *Id.* Dr. Mackel gave Jines no return to work date at that time because, in Jines's view, he "had no work to go back to." *Id.* at 29.

Jines filed this action on November 20, 2002, in the Allen Superior Court and later saw Dr. Mackel again on December 13, 2002. On that date, Dr. Mackel restricted Jines to lifting no more than twenty-five pounds and no "lifting waist to shoulder." *Id.* at 30. Dr. Mackel, however, stated that Jines could return to work without restrictions on January 1, 2003.[11] *Id.* Meanwhile, Evans removed this case to this Court on December 19, 2002. *See* Docket Entry 2.

On January 3, 2003, while this litigation was pending, Evans's counsel sent Jines's counsel a letter stating that "Evans Motors *has had* a position for Mr. Jines that is substantially similar to his old position, but does not require lifting. It is a service porter position at the same pay that Mr. Jines received before." Response to Mo-

---

8. According to Martin, Jines is the only Evans employee ever to take FMLA leave. Martin Dep. p. 24.

9. Martin denies that he or anyone else at Evans made such a statement to Jines. Martin Dep. p. 20–21.

10. Martin disputes Jines's recollection on that point, stating that "Rollie [Jines] also told us that it was going to be another six weeks before he was released from the doctor, which would put him in to the middle of December, we assumed, before he would even be able to work." Martin Dep. p. 16. The significance of this dispute is that by mid-December Jines would have presumably exhausted all twelve weeks of his FMLA leave.

11. Given the lifting involved in Jines's driver position, one could reasonably infer that Jines would not have been able to fully perform the functions of that position until January 1, several weeks after his FMLA leave would have expired.

**1134**

tion for Summary Judgment, Ex. E, p. 1. (emphasis added). This assertion is at odds with what Martin told Jines on October 25, 2002; that a service porter position was open, but at a lower salary than Jines's old driver position. In any event, the letter further provided that Evans would terminate Jines if he did not contact Evans by January 13, 2003. *Id.*

Jines's next contact with Evans came on January 10, 2003, via a letter from Sterk which stated that Jines's employment with Evans was being terminated as of that date "due to your [Jines's] failure to return to work at the expiration of your FMLA leave of absence. We [Evans] deem your refusal to return to work as a voluntary quit." Memorandum In Support of Summary Judgment, Ex. I. Sterk's letter also told Jines that in addition to being paid for his accrued vacation pay, "in conjunction with officially terminating your employment we are extending to you an unconditional offer of reinstatement to the position of service porter." *Id.*

On January 21, 2003, Jines accepted the offer and reported to work at Evans as a porter. Sterk Aff. ¶ 6. However, Jines quit after working only one day. *Id.* Jines's resignation letter states that he quit because he was not utilized as a service porter, as he had expected. *See* Plaintiff's Response, Ex. E, p. 4.

Evans filed its motion for summary judgment on September 8, 2003. Jines filed his response on October 8, 2003, and Evans filed its reply on October 23, 2003.

From the outset, it is obvious that the parties have some large factual disagreements, mainly revolving around when Jines was terminated. For example, Jines maintains he was actually terminated three times: by Lewis over the telephone on October 24, in person by Martin and Armstrong on October 25, and via Sterk's January 10 letter. On the other hand, Evans maintains that Jines was not actually terminated until Sterk sent the January 10 letter. The difference in the dates is significant because if Jines was fired on either of the first two dates it means that he was terminated while still on FMLA leave. On the other hand, if Jines was not actually terminated until January 10, 2003, then he was fired after his FMLA leave had expired, and simply due to absenteeism.

## IV. STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne*, 337 F.3d at 770. When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* The Court's only task in ruling on a motion for summary judgment is " 'to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial.' " *Id.* (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994)). If the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Id.* A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true[,]" as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

## V. ANALYSIS

### A. *FMLA Substantive Rights*

The FMLA provides covered employees with up to twelve weeks of unpaid leave per year "because of a serious health condition that makes the employee unable to

perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). After the period of FMLA leave expires, the employee has the right to be reinstated to his former position or an equivalent one with no loss of benefits. 29 U.S.C. § 2614(a); *Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1017 (7th Cir.2000), *cert. denied* 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000). An employee who requests or takes FMLA leave is "not entitled to any greater rights or benefits than he would be entitled to had he not requested or taken leave." *Serio v. Jojo's Bakery Restaurant*, 102 F.Supp.2d 1044, 1051 (S.D.Ind.2000). To insure the availability of these guarantees, commonly called FMLA substantive rights,[12] the FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any [FMLA] right...." 29 U.S.C. § 2617(a)(1).

■ To establish his substantive FMLA claim, Jines must demonstrate entitlement to his FMLA rights by a preponderance of the evidence. *See Kohls v. Beverly Enterprises Wisconsin, Inc.*, 259 F.3d 799, 804 (7th Cir.2001); *Rice*, 209 F.3d at 1017; *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir.1999); *Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711, 713 (7th Cir.1997). The employer's intent is immaterial. *King*, 166 F.3d at 891.[13]

■ All parties agree that, for FMLA purposes, Jines was an eligible employee and Evans was an employer. The parties apparently further agree that Jines was entitled to FMLA leave, presumably beginning on September 3, 2002. The dispute revolves around whether Evans denied Jines FMLA leave by firing him in October 2002.

Evans's main argument on this point is that it is uncontradicted that Armstrong told Jines on October 25 that Evans would follow the law (presumably the FMLA). However, Jines contends that prior to this somewhat ambiguous commitment, he had already been fired; first by Lewis on the 24th, and later by Martin on the 25th. This contention is bolstered, at least from Jines's point of view, by Evans's hiring a replacement driver and telling Jines that he could return to work only as a porter at lesser pay. In addition, Jines contends that Martin told him that he could be fired at any time without cause because Indiana is a right-to-work state, and that his shoulder injury was insufficient to qualify for FMLA leave. Of course, many of Jines's contentions are disputed by Evans, but at this stage the Court must construe these disputed facts in the light most favorable to Jines. *See Payne*, 337 F.3d at 770.

Indeed, Lewis admits that on the 24th he told Jines that he was "finished," but contends that that statement was unauthorized by Evans because at the time he was merely a "consultant." However, there are factors beyond this gloss that could lead a reasonable juror to conclude that Lewis really did have authority to fire Jines. First, by that time Lewis had already hired Jines's replacement. *See* Lewis Dep. P. 4,6.[14] This leads to the

---

**12.** *See Serio*, 102 F.Supp.2d at 1051.

**13.** Evans's contention that the *McDonnell Douglas* burden-shifting approach applies to Jines's substantive FMLA claim is erroneous. *See Diaz*, 131 F.3d at 712–13. The *McDonnell–Douglas* test is applicable only to Jines's FMLA retaliation claim. *See King*, 166 F.3d at 891.

**14.** "Q. What were you [and Jines] arguing about [during the October 24 telephone conversation]?

A. *Me* hiring Keron Ludwick to be *my* parts driver.

Q. When did *you* hire Keron in that capacity?

somewhat logical inference that if Lewis had the authority to hire a parts driver, he also had the authority to fire one, Jines. *Cf. Underwood v. Waddell*, 743 F.Supp. 1291, 1298 (S.D.Ind.1990) (holding that a sheriff had the authority to terminate a chief deputy even though a statute only expressly gave the sheriff the power to hire a chief deputy because "the general rule throughout this country is that the power to hire necessarily and implicitly carries with it the power to fire. [citations omitted] No authority to the contrary has been located"). Second, Jines says that on October 24, Lewis referred to himself as Jines's boss in the same discussion leading to Jines's termination. *See* Jines Dep. p. 17–18.[15] Moreover, there is also evidence that Evans viewed Lewis as having the necessary authority because when Jines arrived at Evans the next day, termination papers (apparently at Lewis's urging) had already allegedly been prepared. *See Id.* at p. 20.[16] Finally, Lewis cannot explain how Jines could have known that Lewis's unequivocal words of termination were really of no effect. *See* Lewis Dep. p. 8–10.[17]

Similarly, Evans's argument that it could not have infringed upon Jines's FMLA rights because Jines was unable to return to work for seventeen weeks (the length of time between Jines's date of injury and January 1 when he was released to work without restrictions) is likewise unavailing. In essence, Evans is contending that it granted Jines twelve weeks of FMLA leave and only terminated him when he failed to report to work when it was over. However, this argument begs the question, "what work?" because it ignores Jines's contention that he was first fired by Lewis on the 24th, and then again by Martin on the 25th, well before his twelve week leave period was over. Thus, Jines could not have been terminated in the thirteenth week for voluntary absenteeism because by that time he no longer had a job.[18]

A. The middle of October.

. . . . .

A. Basically I told him [Jines] that *I* hired Keron and he [Jines] had no say-so in *me* hiring Keron, whether it be for his position or any other . . . ."
Lewis Dep. p. 4, 6 (emphasis added).

**15.** "Q What else did you two [Jines and Lewis] talk about?
A I [Jines] had said something else, right now I don't remember what it was, but he [Lewis] says, 'I am not here to be your friend. I am here to be your damn boss and make the company money . . . .' He said, 'Your job is done, terminated, end of story.' " Jines Dep. p. 17–18.

**16.** Martin contends that he merely asked Jines "if he wanted to fill termination . . . paperwork out" and that when Jines replied that he was not quitting, "we never filled any termination paperwork out." Martin Dep. p. 18.

**17.** "Q How is Mr. Jines supposed to know that [Lewis had no official authority to terminate employees]?

A. He would have if he'd been at work. I never worked with Rollie [Jines] ever.

. . . . .

Q. But back to Rollie, knowing your capacity with the company and the powers to hire and fire?
A. I had no hire and fire powers.
Q. But how did Rollie know that, can you give us an answer today as to whether Rollie should have known or not known about what your powers were with respect to hiring and firing?
A. When he came in and spoke to Mr. Armstrong, he basically told him he was taking the FMLA then and that we would honor whatever the law states."
Lewis Dep. p. 8–10.

**18.** Evans also offers the unavailing argument that it would have rehired Jines in October for the driver position if he had been released to work. However, construing the evidence in a light most favorable to Jines, by that time Evans had already decided to replace Jines and had taken steps to do so. *See* Lewis Dep. p. 4–5). Moreover, although Evans contends that Jines was unable to perform the neces-

There is also the curious situation involving the service porter position. In October, Evans told Jines that he could opt for that position but at lesser pay. Allegedly, Jines did not view that offer as consistent with Evan's obligations under the FMLA because although it did not require lifting, it also did not provide for equal pay. However, after Jines's FMLA leave expired, Evans offered the same position to him again, see exhibit E ("Evans Motors *has had* a position for Mr. Jines . . . ." (Emphasis added)). This time the offer came with the same pay Jines had received before as a driver. The significance of this can be argued, but viewing it in a light most favorable to Jines, it suggests that back in October Evans knew it had a job Jines could do that provided equal pay, but misrepresented the pay to him and then proceeded to terminate him.

In short, Jines has presented enough evidence to show that he was terminated prior to the expiration of his FMLA leave and this is sufficient to defeat Evans's summary judgment motion on Jines's FMLA substantive claim.[19]

### B. FMLA Retaliation

■ Jines may contest summary judgment on this issue using either the direct or the indirect method of proof. *King*, 166 F.3d at 891–92. The direct method requires Jines to produce enough evidence, whether direct or circumstantial, *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994), to create a triable issue of whether the adverse employment action had a discriminatory motivation. *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1397 (7th Cir.1997).

Direct evidence "usually requires an admission by the decisionmaker that his actions were based on" the protected status (*i.e.*, receipt of FMLA leave). *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 321 (7th Cir.2003). "Direct evidence is evidence, which, if believed by the finder of fact, 'will prove the particular fact in question without reliance upon inference or presumption.'" *Volovsek v. Wisc. Dep't. of Agric., Trade and Consumer Protection*, 344 F.3d 680, 689 (7th Cir.2003) (quoting *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997)) (internal quotation omitted). Jines has no such evidence.

However, Jines may still rely on the indirect method, the well-known *McDonnell Douglas* burden-shifting framework. *See e.g., King*, 166 F.3d at 891–92. Here, Jines must first establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). In order to establish a *prima facie* case, Jines must show that (1) after engaging in, or attempting to engage in protected activity; (2) only he, and not any similarly situated employee who did not engage in the protected activity; (3) was subjected to an adverse employment action; (4) even though he was performing his job in a satisfactory manner. *See Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir.2002), *cert. denied* 537 U.S.

---

sary duties of a parts driver at that time, this contention only highlights the factual disputes between the parties. *Cf.* Jines Aff. ¶ 11. Finally, Jines's twelve week FMLA leave period had not yet expired in October, meaning that he had no legal duty to return to work at that time.

19. Evans's contention that this action is premature does not change the outcome. In Evans's view, Jines filed this action prior to being terminated and prior to the expiration of the entire twelve week FMLA leave. However, Evans has not cited any authority which requires a plaintiff to wait until after the FMLA leave period has expired before filing an action. Furthermore, Jines has presented evidence, albeit disputed, that he was terminated approximately one month prior to filing this action.

879, 123 S.Ct. 79, 154 L.Ed.2d 134 (2002). If this case is made, Evans must proffer a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* The burden then falls on Jines to show that the proffered reason is pretextual. *Id.*

Evans contends that Jines cannot show that he was subjected to an adverse employment action, again relying upon its belief that it allowed Jines to take all of his FMLA leave and did not terminate him until his leave was over and he became absent. Of course, a reasonable juror could believe Evans on this point. However, as earlier discussed, a reasonable juror could believe that Jines suffered an adverse employment action on either October 24 or 25, before his FMLA leave was even over.

Similarly, Evans contends that Jines is unable to establish that he was treated less favorably than any similarly situated Evans employee who did not take FMLA leave. However, as Jines notes, he is the only employee who ever asked for FMLA leave and he was fired, while, it can be inferred, all other drivers remained on the job (after all, except for Jines, Evans was hiring, not firing), and Jines's firing is even more curious given Evans's repeated assertion that it was short-staffed. *See e.g.,* Martin Dep. p. 19, 25–26. Thus, since Jines has shown that he was treated less favorably than similarly situated employees, he has made out a *prima facie* case of FMLA retaliation.

Nevertheless, Evans contends that Jines was terminated for the simple, nondiscriminatory reason that he failed to return to

work following the expiration of his FMLA leave. The burden then falls upon Jines to show that reason is pretextual. He may make such a showing by presenting evidence tending to show that Evans's proffered reason is factually baseless, was not the actual motivation for his discharge, or was insufficient to motivate the discharge. *Nawrot v. CPC Int'l,* 277 F.3d 896, 906 (7th Cir.2002).

Again, the parties disagree about what needs to be shown at this stage. Evans contends that Jines failed to return to work at the end of his FMLA leave, leaving it no choice but to terminate him in January. On the other hand, Jines contends that he didn't return to work after his leave expired because he had already been terminated. The Court is unable at this stage of the litigation to resolve the factual dispute about what happened on October 24 and 25, the days when Jines claims to have been terminated. *See Payne,* 337 F.3d at 770 (holding that a Court must construe the record in the light most favorable to the non-moving party and avoid "the temptation to decide which party's version of the facts is more likely true[,]" as "summary judgment cannot be used to resolve swearing contests between litigants"). The record contains evidence by which a reasonable juror, drawing all inferences in favor of Jines, could conclude that Jines was terminated on one (or both) of those dates. Thus, Jines has presented evidence sufficient to show that Evans's proffered reason is, at least arguably, factually baseless, rendering summary judgment improper.[20]

---

**20.** Although it supports its theory of the case, the fact that Evans paid Jines's insurance premiums until January 2003 does not necessarily compel a finding in Evans's favor. A reasonably prudent juror could still infer that Lewis terminated Jines in October, notwithstanding Evans's continued payment of Jines's insurance premiums (which could, of course, be attributable to a mere accounting error). *See also* discussion *infra* Section V(D).

## C. Vacation Pay

■ Jines's complaint states that Evans failed to pay him his accrued vacation pay within ten days of his last date of employment. *See* Compl. ¶ 8. The Indiana Wage Payment Statute, Ind.Code 22–2–5–1(b), provides that an employee, "upon separation from employment, must be paid the amount due them at their next and usual payday." *Credentials Plus, LLC v. Calderone,* 230 F.Supp.2d 890, 907 (N.D.Ind. 2002). Vacation pay is subject to the provisions of that statute. *Id.* Failure to comply with Ind.Code 22–2–5–1(b) may result in the imposition of liquidated damages "for each day that the amount due to him [the employee] remains unpaid ten percent (10%) of the amount of wages due to him in addition thereto, not exceeding double the amount of wages due...." Ind.Code § 22–2–5–2.

Evans contends that it complied with the Indiana Wage Payment Statute because it tendered Jines his accrued vacation pay on January 10, 2003, the date it contends it terminated him. Jines alleges, however, that he was terminated in October, meaning that Evans's tender of his vacation pay was tardy.

Again, the Court, construing all of the facts in a light most favorable to Jines, finds that a genuine issue of material fact exists concerning Jines's termination date. This means that it cannot be stated at this time whether Evans complied with the Indiana Wage Payment Statute, and therefore its motion for summary judgment on that issue must be denied.[21]

## D. Evans's Counterclaim

■ Evans's counterclaim seeks recovery for the $425 in insurance premiums it paid for Jines while, according to Evans, Jines was on FMLA leave. *See* Amended Answer & Counterclaim, ¶ 11–15. According to Evans, 29 C.F.R. § 825.213(a) permits it to recover the $425. That regulatory subsection provides in relevant part that "an employer may recover its share of health plan premiums during a period of unpaid FMLA leave from an employee if the employee fails to return for work after the employee's FMLA leave entitlement has been exhausted or expires, unless the reason the employee does not return is due to: ... (2) Other circumstances beyond the employee's control." 29 C.F.R. § 825.213(a).

Jines contends that 29 C.F.R. § 825.213 is inapplicable as he did not fail to return to work after the expiration of his FMLA leave because he had already been terminated. Thus, he contends, his failure to return to work was attributable to a circumstance beyond his control. This presents another variation on the general overall theme of this case.

Neither party has cited a case with similar facts, and the Court has not been able to independently locate one. Nevertheless, the purpose of the regulation is clear, and if Evans's version of Jines's termination date is accepted, 29 C.F.R. § 825.213(a) would render its counterclaim meritorious. However, if Jines's contention that he was fired in October is believed, then that would perforce be a situation outside Jines's control, negating Evan's counterclaim. As the resolution of this genuine issue of material fact is for the finder of fact, *Payne,* 337 F.3d at 770, Evans's motion for summary judgment on its counterclaim must be denied.

---

21. For the same reasons, Evans's motion for summary judgment on Jines's conversion claim must be denied.

## VI. CONCLUSION

For the reasons set forth *supra,* Evans's motions for summary judgment, Docket Entries 21 and 23, are **DENIED.**