**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 26 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MARGARET E. WATSON,

      Plaintiff-Appellant,

v.

GALE A. NORTON, [1] Secretary, U.S.
Department of the Interior,

      Defendant-Appellee.

No. 99-1450

(D.C. No. 97-WY-1166-WD)
(D. Colo.)

---

**ORDER AND JUDGMENT** [2]

---

Before **BRISCOE, BALDOCK,** and **MURPHY** , Circuit Judges.

---

      Plaintiff Margaret E. Watson appeals from rulings by the district court prior to and following a jury trial on her claims of racial discrimination and retaliation against her former employer. We affirm in part, reverse in part, and remand for further proceedings on the racial discrimination claim.

I.

---

    [1] Pursuant to Fed. R. App. P. 43(c)(2), Gale A. Norton is substituted for Bruce Babbitt, Secretary of the Interior, as a defendant in this action.

    [2] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Watson was hired as a reference librarian by the United States Department of the Interior Geological Survey (USGS) in March 1984. Between 1984 and 1991, she received performance ratings of outstanding or excellent. She was the only African-American employee at the library from 1991 until her termination.

In 1991, Tommie Ann Gard became Watson's supervisor. Gard began pressuring Watson to become a member of the ethnic minority committee. In March 1992, Gard assigned Watson the tasks of weeding out pamphlets and articles that were no longer needed and reshelving books.

Watson filed a complaint with the Equal Employment Opportunity Commission (EEOC) in 1993, alleging racial discrimination as a result of a comment on her annual performance appraisal. Gard was aware that the complaint had been filed. Barbara Wagner became branch librarian in 1994 and was Gard's immediate supervisor. Wagner was vaguely aware of the EEOC claim. The complaint was dismissed for failure to accept an offer of full relief.

In October or November 1994, Watson was given one week to devise a plan to reverse the call number order of the titles and the reference stacks. She contacted staff at the library headquarters in Virginia for advice on the project. She was reprimanded for failing to complete the task on time, for communicating with library headquarters, and for failing to communicate with her superiors.

On December 29, 1994, Gard assigned Watson to prepare a serials holding

list, in addition to her other work. She was to list all serial publications and their call numbers in alphabetical order, including information about missing issues, name changes, and alternative names. The previous list was outdated and the library was considering cutting costs by reducing the number of publications ordered. Wagner approved the assignment. Gard instructed Watson to complete the alphabetical list of the serial titles and their call numbers by February 15, 1995. Gard testified that she estimated how long the task should take after looking at the Kardex file and concluding the information in that file was accurate. Watson had limited access to the Kardex file and found it to be inaccurate. Watson discussed the assignment with people who worked in technical services because they had experience with comparable tasks. Based upon those discussions, Watson concluded she had been set up to fail because the time frame was unrealistic. Watson spoke with Peggy Merryman, the head of acquisitions at the library headquarters, about cancellation lists and serial lists. After learning of this conversation, Gard told Watson not to contact library headquarters again without Gard's permission. Other librarians regularly communicated with library headquarters.

On February 13, Watson informed Gard that she would not be able to meet the first deadline of February 15 because of her inability to obtain sufficient access to the Kardex and a computer. Gard did not discipline Watson for this

delay.  In late February, Wagner announced that the library was being reorganized and Watson was transferred to the position of team coordinator of technical services.  Watson had never worked in technical services and had received no training in that area for over twenty years.  The duties in technical services were the routine duties of a trained librarian.  Despite the transfer, Gard instructed Watson to continue to work on the serials list.  Gard informed Watson in March that the list was to include the specific volumes the library held of each title and  Watson was given a new deadline of May 1.  In early March, Wagner and Gard met with Watson to discuss an allegation that Watson had been disrespectful to the director of the USGS library, Ed Liszewski.

Watson filed a charge of discrimination with the EEOC in March 1995.  Gard was aware of this claim and discussed it with Wagner.  Watson alleged racial discrimination and retaliation based on an incident in December 1994 where she was considered absent without leave instead of on bereavement leave to attend her uncle's funeral.  The USGS denied Watson's claim and Watson appealed.  The EEOC did not rule on her appeal.  After Watson submitted additional documentation, her leave was changed to bereavement leave in January 1995.

Between March and May 1995, Gard discussed the progress of the project with Watson on a weekly basis.  Watson told Gard that she had difficulty finding

time to work on the project. Gard assured Watson her performance was not being evaluated because she was learning her new duties at technical services. However, on April 20, Gard counseled Watson, reminding her the list was due May 1. In late April or May, Watson expressed to Gard her concern that her workload was significantly higher than that of other employees. Gard allegedly grinned at her in response and told Watson her work plan was fair. Watson did not meet the May 1 deadline and Gard issued a written reprimand on June 30. Gard instructed Watson to work one hour per day on the project.

Watson was reprimanded for not following proper procedure for requesting leave for the July 4 holiday. In response, Watson filed an EEO charge on July 21. On July 25, Wagner directed Watson to work twenty hours per week on the list, which was to be completed by September 15. On that same day, Wagner proposed that Watson be placed on a three-day suspension without pay, and Watson was suspended. Watson filed a formal grievance. Beginning on July 31, Watson was required to keep a log of her time spent on the list. Watson did not meet the September 15 deadline and turned in the list as completed to that point. On October 2, Wagner gave Watson a new deadline of November 30. Watson was instructed to work full-time on the project, with some exceptions. Wagner recommended a fourteen-day suspension, but Watson was not suspended.

Watson did not meet the November 30 deadline and Gard demanded that

Watson give the list to her. In December 1995, Wagner and Gard discussed whether Watson should be terminated. In February 1996, Watson received the proposal that her employment be terminated. The next day, Wagner and Gard notified Watson she was being transferred to the former Bureau of Mines library. No one was assigned to complete the list.

Watson wrote to David Russ, the acting associate chief geologist at library headquarters to protest her removal. Russ issued a "Decision on Proposal to Remove," sustaining the decision to remove Watson, effective April 15, 1996. As the final decision maker, Russ stated the reasons for termination were Watson's refusal to perform work assignments and refusal to follow directions. Watson appealed to the Merit Systems Protection Board (Board) and a formal hearing was held before an Administrative Law Judge (ALJ), who affirmed the agency's decision.

Watson filed her complaint in district court, alleging racial discrimination and retaliation in violation of 42 U.S.C. § 2000e-16(a), which provides that "[a]ll personnel actions affecting employees or applicants for employment . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." USGS filed a motion to dismiss or, in the alternative, for summary judgment. A magistrate court dismissed three counts of the complaint. After presentation of Watson's case at the jury trial, the district court granted in part

USGS's motion for judgment as a matter of law, holding that Watson's transfer to technical services was not an adverse action and that the only adverse action that Watson suffered was termination. During deliberations, the jury sent a note to the district court that included a statement of how the jury stood numerically on the issues. The court declared a mistrial. The court then granted USGS's motion for judgment as a matter of law on the racial discrimination and retaliation claims.

## II.

We review discovery rulings for an abuse of discretion. See Cole v. Ruidoso Mun. Schs., 43 F.3d 1373, 1386 (10th Cir. 1994). Similarly, evidentiary rulings "generally are committed to the very broad discretion of the trial judge, and they may constitute an abuse of discretion only if based on an erroneous conclusion of law, a clearly erroneous finding of fact or a manifest error in judgment." Webb v. ABF Freight Sys., Inc., 155 F.3d 1230, 1246 (10th Cir. 1998). If we find an erroneous discovery or evidentiary ruling, Watson would be entitled to a new trial only if the error affected her substantial rights. See id.

We review de novo the district court's determination of a motion for judgment as a matter of law, applying the same standard as the district court. Mason v. Okla. Turnpike Auth., 115 F.3d 1442, 1450 (10th Cir. 1997). Judgment as a matter of law is appropriate "[i]f during a jury trial a party has been fully

7

heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a). "[A] court may grant the motion 'only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position.'" Finley v. United States, 82 F.3d 966, 968 (10th Cir. 1996) (quoting Q.E.R., Inc. v. Hickerson, 880 F.2d 1178, 1180 (10th Cir. 1989)).

## III.

Watson argues that the district court erred in denying her motion to reopen discovery, denying her motion to take preservation depositions, limiting testimony, determining her transfer was not an adverse action, and granting USGS's motion for judgment as a matter of law.

### Motion to Reopen Discovery

Watson argues that her May 22, 1998, motion to modify the scheduling order to extend the discovery deadline should have been granted. The original discovery cutoff was March 31, 1998. On March 13, 1998, Watson's original counsel moved to withdraw. At that point, counsel had not taken any depositions. On March 17, the magistrate court granted the motion to withdraw, and replacement counsel entered an appearance on May 15, 1998.

Watson requested that the scheduling order be modified to extend all of the deadlines so she could complete discovery and prepare for trial. In denying the

motion for modification of the scheduling order, the magistrate explained that "[d]iscovery was completed and prior counsel for plaintiff participated in the Pretrial Conference." App. I at 209. Watson did not object to the magistrate's order. See Fed. R. Civ. P. 72(a) ("Within 10 days after being served with a copy of the magistrate judge's order, a party may serve and file objections to the order; a party may not thereafter assign as error a defect in the magistrate judge's order to which objection was not timely made."). We lack jurisdiction over Watson's appeal from the magistrate's denial of the motion to amend the scheduling order. See Hutchinson v. Pfeil, 105 F.3d 562, 566 (10th Cir. 1997) (holding "[p]roperly filed objections resolved by the district court are a prerequisite to our review of a magistrate judge's order under 28 U.S.C. § 636(b)(1)(A)"); Moore v. United States, 950 F.2d 656, 659 (10th Cir. 1991) (holding failure to timely object to a magistrate's findings waives appellate review of factual and legal questions).

Motion to Take Preservation Depositions

After the district court sua sponte moved the trial date to September 21, 1998, Watson filed a motion to take the preservation depositions of Nancy Blair and Diane Lewis. The magistrate denied the motion. The magistrate noted that an earlier motion to reopen discovery had been denied. As to the testimony of Blair and Lewis, the magistrate found:

9

> It is clear by the transcript of Blair she has no knowledge of Plaintiff's attempt to compile the list of the library serial holdings in Denver. Both Blair and Lewis would testify as to their compiling of the lists at their respective libraries. Plaintiff has provided no case law how that would be relevant. The issue before the Court is not whether Defendant failed to give her sufficient time to carry out her assigned job but evidence of whether she was removed from her position because of her race or in retaliation.

App. II at 501-02. On November 12, Watson filed objections to the magistrate's ruling. The district court overruled Watson's objections, finding the testimony of Blair and Lewis was not relevant. Blair's testimony from the Board hearing showed that she had limited actual knowledge regarding Watson's particular project. Lewis also possessed no personal knowledge regarding Watson's situation, and her testimony would be cumulative to Blair's testimony.

A district court has the authority to reopen the record and consider new evidence at any time before final judgment is entered. See LaMarca v. Turner, 995 F.2d 1526, 1548 (11th Cir. 1993); see also Fed. R. Civ. P. 59(a).

> Appellate decisions have identified several relevant factors in reviewing decisions concerning whether discovery should be reopened, including: 1) whether trial is imminent, 2) whether the request is opposed, 3) whether the non-moving party would be prejudiced, 4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court, 5) the foreseeability of the need for additional discovery in light of the time allowed for discovery by the district court, and 6) the likelihood that the discovery will lead to relevant evidence.

Smith v. United States, 834 F.2d 166, 169 (10th Cir. 1987). We discuss the six Smith factors as they relate to Blair and then discuss the issue of Lewis'

10

testimony.

First, trial was not imminent at the time the motion was filed. The second and third Smith factors relate to the non-moving party. USGS opposed Watson's motion. It does not appear, however, that USGS would be prejudiced since Blair was listed in the pretrial order as a witness, and it was expressly contemplated that her testimony would be offered by preservation deposition. See Murrey v. United States, 73 F.3d 1448, 1454 (7th Cir. 1996) (finding no prejudice where witness listed in pretrial order); United States ex rel Consol. Elec. Distribs., Inc. v. Altech, Inc., 929 F.2d 1089, 1092 (5th Cir. 1991) (allowing reopening of discovery where witness suddenly unavailable).

With regard to diligence in obtaining discovery within the guidelines established by the court, depositions were scheduled for March but they did not take place. The magistrate granted Watson's original attorney's motion to withdraw on March 17. A pretrial conference was held that same day and the court entered a final pretrial order, stating that Nancy Blair and Diane Lewis would testify by preservation depositions. The order also stated that discovery had not yet been completed. The order did not provide for additional time beyond the March 31 discovery deadline. Replacement counsel entered an appearance on May 15, 1998, and immediately moved that the scheduling order be modified. This motion was denied. After the motion was denied, counsel "made

11

arrangements with both Ms. Blair and Ms. Lewis to have them testify." App. II at 369. As it got close to the trial date, Blair and Lewis (who were not under subpoena) refused to testify voluntarily. Absent a voluntary appearance by the witness, the "sole means of presenting [such a witness'] testimony . . . is through use of a preservation deposition." Odell v. Burlington N. R.R. Co. , 151 F.R.D. 661, 663 (D. Colo. 1993). Counsel was diligent in asking to take a preservation deposition once he understood that Blair would not testify voluntarily. It therefore appears that Watson's original counsel was not as diligent as he should have been, but Watson's replacement counsel was diligent in pursuing the matter.

The fifth factor is foreseeability of the need for additional discovery in light of the time allowed for discovery. As discussed above, the need for these preservation depositions was foreseen in the pretrial order. When the magistrate simultaneously agreed that Watson could take the additional depositions and that Watson's counsel could withdraw, it was foreseeable that Watson might be unable to obtain counsel within the remaining two weeks before the discovery period ended. At that point, discovery would need to be reopened to complete the promised depositions. Further, the court was on notice there were problems completing discovery prior to the pretrial conference.

The final Smith factor is the likelihood that the discovery will lead to

12

relevant evidence. [3] It was on this ground that the magistrate and district court rejected Watson's request for additional discovery. The ALJ noted that he did not find Blair's testimony relevant. The only area in which Blair's testimony may be relevant is with respect to the Kardex file. Blair had redone the Denver Kardex approximately five years prior to the Board hearing. Blair testified that the periodical records "had not been kept up during all the years and there were kind of non-centralized locations where serials were entered" and that there were "a lot of miscellaneous records that were very hard to read." App. II at 351.

Watson's overall argument is that she was set up to fail in this assignment by being given a project that was too time-consuming and complex to be completed in the allotted time. Gard testified that Watson could have relied on the Kardex files, making this a very simple task. Nancy Greer, who testified regarding how long this task should have taken, relied on the accuracy of the Kardex files in making her determinations. Testimony substantiating Watson's claim that the Kardex files could not be relied upon to complete this assignment would have helped to show that the project required a great deal of time and the checking of multiple sources. Blair's testimony somewhat impeaches the

---

[3] "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

13

reliability of the expert testimony. While there is an argument to be made that Blair's testimony is relevant, reasonable minds could differ. Whether the Kardex was reliable was one factor in the issue of whether the serials list was a time-consuming and difficult task. That issue, in turn, was part of the larger issue of whether Watson was set up to fail. The set-up-to-fail theory is part of the larger argument that Watson suffered racial discrimination. Considering the six factors overall, the district court did not abuse its discretion in refusing to reopen discovery for Blair's preservation deposition.

The final question is whether the district court abused its discretion in refusing to reopen discovery so that Watson could take Lewis' deposition. Throughout the proceedings, Watson has conceded that Lewis' testimony would be essentially the same as Blair's with respect to how to prepare a serials list. Lewis would not have been able to testify about Watson's assignment specifically, nor was she familiar with the Denver Kardex. Accordingly, the district court did not abuse its discretion.

Limitation of Testimony

Isabella Hopkins gave sworn testimony at the Board hearing. Prior to trial, Hopkins passed away. Watson asked to read Hopkins' entire testimony into the record, but the district court limited the portions to be presented to the jury, rejecting certain testimony as irrelevant and as more prejudicial than probative.

Watson argues that the court should have allowed Hopkins's testimony regarding Watson's encounter with Liszewski. Hopkins testified: "And, a thing I observed when the director of the USGS library visited us, they claimed that she had sort of snubbed him and we were all there. I couldn't understand what they were talking about or how they came up with that." App. I at 244. The district court ruled that this testimony was hearsay within hearsay and vague. We agree. Even if it were error, there is no explanation as to how failure to allow the statement was prejudicial to Watson's case.

Watson argues that the district court should have allowed Hopkins' testimony regarding Gard's expression of racial prejudice. Hopkins testified that Gard made comments about Hopkins' family that suggested Gard harbored prejudice against Hispanics. Hopkins also testified that Gard's attitude appeared prejudicial against Watson because she made comments that did not address Watson's abilities as an employee. The district court found the testimony to be imprecise. We agree. The testimony regarding Hispanics does not show prejudice against Watson. Hopkins' description of Gard's attitude is extremely vague and subjective. Hopkins did not identify any racist comments made by Gard or testify to any other specific indications that Gard was prejudiced.

Watson argues that the district court should have admitted Hopkins' testimony regarding Watson's EEO complaints and retaliation. Hopkins testified

15

that she complained to Harold Clayton, head of the EEO office, about the treatment Watson received. The district court excluded this evidence because it was unclear when the conversation took place and what exactly was said. This exclusion was not an abuse of discretion.

In response to a question regarding whether Hopkins observed Wagner doing or saying anything toward Watson that was discriminatory in nature on the basis of race, the district court excluded the follow portion of Hopkins' reply:

> Because it was there in any action, in any thought, in anything that had to do with this employee. Because how could anyone do that under her group? You know, so it was like she had been attacked even though it happened before her time. And, I can't make that different. Maybe that's racial, maybe it's not. See? But, theoretically, any of us who had an EEO complaint had the right to have the complaint and not have that held against us because it wouldn't be continuing. Once it was over, it was over.

App. I at 255. The district court held that this testimony was a "diatribe by this witness" that was unhelpful to the jury. App. IV at 1252. The testimony is vague and non-responsive to the question. Even if the district court erred, Watson's case was not prejudiced by not having this evidence admitted.

<u>Transfer Not Adverse Action</u>

In considering USGS's motion for judgment as a matter of law, the district court held that Watson's transfer was not an adverse employment action. The court held that, of the relevant events, only Watson's termination qualified as an adverse action for Title VII purposes.

16

The Supreme Court has explained that a "tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998). We have liberally defined the phrase "adverse employment action." Sanchez v. Denver Pub. Sch., 164 F.3d 527, 532 (10th Cir. 1998). "Such actions are not simply limited to monetary losses in the form of wages or benefits. Instead, we take a 'case-by-case approach.'" Id. Nevertheless, we will not consider "a mere inconvenience or alteration of job responsibilities" to be adverse employment action. Id. (quoting Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993)).

In Sanchez, the plaintiff was transferred from teaching fourth grade at one school to teaching second grade at another school where she did not get along with her supervisor. We held that the transfer was not an adverse employment action because Sanchez' salary and benefits remained the same, Sanchez continued to teach at the elementary school level, and the decreasing student population justified the transfer. The primary inconvenience that Sanchez suffered was an increased commute. We concluded that because Sanchez experienced "a purely lateral transfer," there was no adverse action. Id.

Similarly, Watson's transfer to technical services did not change her salary,

17

rank, or grade. She continued to work in the same building with the same supervisor. While her new responsibilities were different, Watson was qualified to undertake her new duties. Watson experienced a lateral transfer that created some inconveniences. Such a transfer does not rise to the level of adverse employment action.

<u>Judgment as a Matter of Law – Racial Discrimination and Retaliation</u>

Following the mistrial, the district court granted USGS's motion for judgment as a matter of law on the racial discrimination and retaliation claims. Watson argues that the district court impermissibly weighed the evidence and evaluated credibility in making this ruling. As we review the issue de novo, the question is whether "the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position." <u>Q.E.R.</u>, 880 F.2d at 1180.

Both the race and retaliation claims are analyzed using a test first articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973). Under that test, the plaintiff carries the initial burden of establishing a prima facie case. The burden may then shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection. The burden then shifts back to the plaintiff to show that the employer's stated reason is pretext. This burden-shifting analysis drops away entirely once the case goes to trial. <u>Kendrick</u>

18

v. Penske Transp. Servs. Inc., 220 F.3d 1220, 1228 n.7 (10th Cir. 2000). At that point, it is the plaintiff's burden to prove racial discrimination or retaliation. See Equal Employment Opportunity Comm'n v. Flasher Co., 986 F.2d 1312, 1316 (10th Cir. 1992). Essentially, at trial the plaintiff is attempting to prove pretext. "So long as the plaintiff has presented evidence of pretext (by demonstrating that the defendant's proffered non-discriminatory reason is unworthy of belief) upon which a jury could infer discriminatory motive, the case should go to trial. Judgments about intent are best left for trial and are within the province of the jury." Randle v. Aurora, 69 F.3d 441, 453 (10th Cir. 1995).

Watson argues she presented sufficient evidence of pretext to send the case to a jury. USGS argues that it has presented two reasons for Watson's termination (failure to complete the serials list and failure to communicate properly with her supervisors), and Watson has failed to show pretext. If there is evidence in the record that these two reasons are unworthy of belief and that the reasons were a pretext for discrimination, Watson is entitled to a trial.

There is no dispute that Watson did not complete the serials list. There is also no dispute that Watson missed several deadlines and often did not spend as much time working on the project as she was directed. However, there is a material dispute of fact as to whether Watson was assigned the task in order to set her up to fail. Other circuits have recognized that pretext can be proven by

19

showing that a supervisor set an employee up to fail. See, e.g., Serrano-Cruz v. DFI Puerto Rico, Inc., 109 F.3d 23, 26 (1st Cir. 1997); Stacks v. Southwestern Bell Yellow Pages, Inc., 27 F.3d 1316, 1325-26 (8th Cir. 1994); Shager v. Upjohn Co., 913 F.2d 398, 405 (7th Cir. 1990).

The record contains evidence that the serials list was too complex and time-consuming to be completed in the assigned amount of time, particularly in light of Watson's workload and new responsibilities in technical services. Gard testified that she was aware Watson was checking multiple sources and acknowledged that checking multiple sources would lengthen the amount of time required. When Watson expressed her concern to Gard about her workload, Gard allegedly grinned and told Watson that her work plan was fair, without investigating whether it was fair. When Watson accused Gard and Wagner of setting her up to fail, they did not deny the accusation. After Watson's termination, no one was assigned to complete the serials list. Additionally, one of the primary reasons that Watson said she was unable to complete the task was because of the new duties and training required by her transfer to technical services. As Watson had no particular expertise, experience, or training in the technical services area, one could conclude that Wagner transferred Watson in order to further decrease her ability to complete the project because the transfer would mean that Watson would have less time available. In fact, immediately after the transfer, Gard

20

increased the work required by asking that the list include the specific volumes in the library. Further, Watson previously had been given a time period of only one week to devise a plan to reverse the call number order of the titles, although the project required more time. Consequently, Watson was reprimanded for failure to complete the task on time. Based on this evidence, a jury could conclude that Gard and Wagner assigned Watson the serials list because she would be unable to complete it in the time allotted, creating an excuse to terminate Watson.

According to Russ, Wagner, and Gard, Watson failed to communicate appropriately with her superiors. Watson did not provide her superiors with as much information about the status of her project as they wanted. In addition, she ignored her superiors when they spoke to her or refused to look at them while talking to them. She was warned several times about the manner in which she communicated with her superiors. Kay Baker, a reference librarian also testified regarding Watson's lack of communication with her superiors. Further, Watson was accused of behaving rudely to Liszewski.

To some extent, Watson testified that the accusations of her failure to communicate were inaccurate. She testified that she had not refused to perform work and that she had told her supervisors what she needed to complete the project. Watson denied ignoring Gard. Deborah Rowen, a coworker, testified that Watson had not been rude to Liszewski. Some coworkers testified they did

21

not notice anything inappropriate about the way Watson communicated with her superiors. The bulk of the testimony on Watson's lack of communication came from Wagner and Gard, the people who purportedly were setting Watson up to fail. Thus, a jury could conclude that those accusations were not credible even without conflicting testimony. Even if the jury believed Watson had communication issues with her superiors, the question is whether a jury could believe this failure to communicate was not a credible reason for terminating Watson. Russ was asked whether the two reasons for terminating Watson were independent–that is, whether Watson could have been terminated for either reason by itself. Russ responded that the failure to complete the serials list, by itself, was a sufficient reason for termination. This answer suggests that Watson's lack of communication by itself would not be a sufficient reason. Because Watson has created an issue of fact with regard to whether she communicated with her superiors, as well as whether lack of communication was a credible grounds for termination, a jury could conclude that the communication issues were a pretext for termination.

Even if the jury concluded that both of the reasons given for Watson's termination were pretextual, Watson would still need to show that the reasons were a pretext for racial discrimination. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 120 S. Ct. 2097, 2108 (2000). "Proof that the

22

defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." Id.; see also Flasher Co., 986 F.2d at 1320 ("Of course, the plaintiff may argue that irrational or unexplained differential treatment is secretly motivated by illegal discrimination, and if the plaintiff persuades the fact finder of that, the plaintiff will satisfy that portion of his or her burden of proof in a Title VII disparate treatment claim.").

Watson presented evidence that she was the only black person working at the library and that she suffered disparate treatment. Watson was pressured to join an ethnic minority committee. She was given unfavorable tasks such as weeding out pamphlets and reshelving books. Previously, all of the librarians were responsible for reshelving, and after Watson was terminated all of the librarians were again responsible for reshelving. Watson was given two assignments with unrealistic completion dates, while her coworkers were not assigned such allegedly complex and time-consuming additional tasks to perform. Watson was required to document her medical leave while other employees were not. Watson was reprimanded for not following the proper procedure for applying for leave. Other employees who did not follow the proper procedure were not reprimanded. Watson was not permitted to speak with librarians at library headquarters while other librarians were permitted to do so. Only Watson

23

was required to keep a log of her work hours. Watson's comments were not acceptable to Wagner and Gard while other employee's comments, even if substantively the same as Watson's, were acceptable. Rowen testified that she perceived that Watson was treated differently than other employees and believed that it was because of Watson's race.

Further, Watson's treatment upon her transfer to the Bureau of Mines library was unusually harsh. Watson was banned from the USGS library. When Watson entered the USGS library to do work for her new job, Wagner yelled at Watson to leave before she called the Federal Protective Service. No one explained to Watson why she was not permitted to use the USGS library, and no one else was banned from the library. Watson subsequently received a memo from Wagner saying that if Watson came to the USGS library, Wagner would call Federal Protective Services to remove Watson.

USGS argues that Watson is unable to prove pretext because the final decision to terminate her was made by Russ and there is no evidence of discriminatory animus or disparate treatment by him. There is no dispute that Russ was an unbiased decision-maker who conducted an independent investigation into the issues surrounding Watson's termination. In McCue v. Kansas Department of Human Resources, 165 F.3d 784 (10th Cir. 1999), we affirmed a district court's rejection of the argument that "intent [for purposes of a

Title VII retaliation claim] must reside in the entity with final termination authority." Id. at 788 (alteration in original). The district court had also noted that "were the premise true, the resulting law would be unreasonable – 'reward[ing] deceitfulness by insulating an organization from liability for retaliatory discharge where the decision-maker is kept ignorant of its subordinates' scheme.'" Id. (alteration in original). We went on to conclude that, in Title VII cases, agency principles control liability. See id.; but see Kendrick, 220 F.3d 1220. Based on this precedent, the independent investigation by Russ does not shield USGS from liability for the actions of its agents, Wagner and Gard.

To prevail on a retaliation claim, Watson needs to show a causal connection between her protected activities of filing EEO complaints and the adverse actions taken against her. See Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1320 (10th Cir. 1999). As discussed above, the only adverse action at issue is Watson's termination. Watson filed five EEO complaints. Testimony established that Gard was aware of the 1993 complaint and the May 1995 complaint. Wagner was vaguely aware of the 1993 complaint and was aware of the May 1995 complaint. Wagner proposed that Watson be terminated in February 1996, and the termination was effective in April 1996. There is no evidence that there was a relationship between the EEO complaints and Watson's termination. There was a

25

significant time lapse between those EEO complaints of which Gard and Wagner were aware and Watson's termination. See Bullington, 186 F.3d at 1320 (remoteness in time undercuts inference of retaliatory motive). There is no substantive testimony showing that Gard and Wagner sought to retaliate against Watson. The only testimony on the subject was from Hopkins, but that testimony was speculative. Hopkins did not articulate a basis for her belief that Wagner was retaliating for the EEO complaints. Watson's theory, that she was set up to fail in being given the serials list assignment, is problematic because that assignment preceded most of her EEO complaints. The only complaint prior to that assignment was in September 1993, more than a year prior to her receiving the assignment. In addition, Wagner was not employed by USGS at that time.

IV.

We AFFIRM the district court's decisions denying the reopening of discovery, denying preservation depositions, limiting testimony, and determining Watson's transfer was not an adverse action, and the court's dismissal of Watson's retaliation claim. We REVERSE the court's dismissal of Watson's claim for racial discrimination and REMAND for further proceedings on that issue.

Entered for the Court

Mary Beck Briscoe
Circuit Judge

26

.