David E. SNELLING, Plaintiff,

v.

CLARIAN HEALTH PARTNERS, INC., Defendant.

No. IP00–0849–C–T.

United States District Court, S.D. Indiana, Indianapolis Division.

Feb. 21, 2002.

Mary Jane Lapointe, Lowe Gray Steele & Darko, Indianapolis, IN, for Plaintiff.

Kim F. Ebert, Ogletree Deakins Nash Smoak & Stewart, Indianapolis, IN, Kristin B. Keltner, Ogletree Deakins Nash Smoak & Stewart, Indianapolis, IN, for Defendant.

## ADOPTION OF REPORT AND RECOMMENDATION

TINDER, District Judge.

The Magistrate Judge submitted his Report and Recommendation on January 30, 2002, and counsel was afforded due opportunity pursuant to statute and the rules of this court to file objections thereto. No objections were filed. The court has reviewed the Report and Recommendation and now **APPROVES** and **ADOPTS** the Magistrate Judge's Report and Recommendation as that of the court.

Defendant Clarian Health Partners' Motion for Summary Judgment is **DENIED** for the reasons stated in the Report and Recommendation.

MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BAKER, United States Magistrate Judge.

Plaintiff David Snelling worked for Defendant Clarian Health Partners in its clinical engineering department as a Biomedical Engineering Technician II ("BMET II"). He brings this action under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et. seq.*, alleging that Clarian violated the FMLA by failing to restore him to his employment upon being released to return to work, and retaliated against him for exercising his right to leave. Clarian claims it terminated Snelling's employment due to alleged performance problems and for misrepresenting work he completed before his leave.

Clarian moved for summary judgment on both claims. Viewing the evidence in a light most favorable to Snelling, Snelling creates genuine issues of material fact as to whether Clarian failed to restore him to his employment upon being released to return to work, and whether Clarian subjected him to retaliation for exercising his right to leave. Therefore, for the reasons set forth below, the Magistrate Judge recommends that Clarian's motion for summary judgment be DENIED.

## I. Factual Background

### A. Employment with Clarian

The evidence viewed in a light most favorable to Snelling reveals the following. In December 1985, Snelling began his employment with Methodist Hospital, working in its clinical engineering department. In 1997, Methodist, Indiana University, and Riley Hospitals merged to form Clarian Health Partners, the Defendant in this action. Thereafter, Snelling became an employee of Clarian, and continued his employment as a BMET II.

As a BMET II, Snelling's main responsibilities were the maintenance, modification, and installation of biomedical equipment. He was supervised by Michael Bernstein, the manager of Clarian's clinical engineering department and supervisor of all BMETs. Snelling was assigned responsibility for supporting the Beltway centers, which includes various small neighborhood clinics throughout Indianapolis. Although it was never formally assigned to him, Snelling also had responsibility for the Family Practice Center.

The clinical engineering department also employed BMET Is, who have primary responsibility for preventive maintenance ("PM") and performed some low level repairs. BMET IIIs managed equipment installation projects and assigned, supervised, and monitored the work of BMET Is and IIs.

The business of the clinical engineering department includes four core tasks: repairs, preventive maintenance inspections ("PM" or "PMI"), red tags, ( preventive maintenance failures), and unwanted situations (which include abused items). Although it did not always occur, in practice, each of these tasks had a work order associated with it. The BMET performing the work was responsible for documenting on a work order the work performed.

### B. Alleged Performance Problems

In 1999, Bernstein faced increased pressure to justify the existence of the clinical engineering department as Clarian contemplated contracting out the department's work. During staff meetings in 1999, "due to the serious nature of [the] current and future budget," Bernstein, on a regular basis, directed all BMETs to "document everything,"[1] and set a 70%

---

1. Although Snelling disputes this assertion, Clarian claims that certain tasks performed

documentation level for all work performed, meaning that at least 70% of the time spent at work must be accounted for on work orders and recorded in the database. [Bernstein Dep., pp. 178–79; Snelling Affid., ¶ 14].

In the summer of 1999, Snelling told Bernstein and BMET III Phil Diehl that he was experiencing health problems with gastroesophogeal reflux disease (GERD) and a hiatal hernia, and that surgery was more than likely. Shortly thereafter, on August 12, 1999, Snelling received a Corrective Action/Performance Improvement Plan ("CA") from Bernstein that stated he needed to catch up on his paperwork from work he performed at the Beltway and Healthnet facilities. This was necessary so that Clarian's administration would be aware how much money was being spent by his department at those facilities. [Snelling Dep. Ex. 13]. Further, unlike his fellow co-workers who were afforded one week, the CA directed Snelling to complete documentation of work he performed at the close of business the next day. *Id.* On October 18, 1999, Snelling received another CA in which Bernstein was critical of Snelling's alleged failure to document his work, noting Snelling's "work documented has shown improvement, but is still not complete." [Pl.Ex. 15].

Sometime around Thanksgiving of 1999, Snelling informed Bernstein that surgery to remedy his condition was imminent. On January 19, 2000, Snelling received another CA for "noncompletion of paperwork/documentation." The CA also direct-ed Snelling to keep current on his backlog and catch up on all PMs by February 11, 2000. [Pl.Ex. 19]. Snelling complained to Bernstein that these parameters were a mathematical impossibility to complete by February 11, a fact Bernstein acknowledged. For instance, under the terms of the CA, he was expected to catch up on over 300 PMs and continue to perform his regularly assigned work. In addition, although Bernstein was critical of Snelling for his alleged documentation problems, other employees did not document their times as Bernstein directed in the 1999 staff meetings, and received no written corrective action like Snelling.

### C. Events Giving Rise to Suit

In early 2000, Snelling applied for, and Clarian subsequently approved, a medical leave so he could have surgery. Clarian does not dispute that Snelling took a medical leave under the FMLA.

On the heels of Snelling's leave, the clinical engineering department was entering a very busy time. In addition to trying to legitimize the existence of the department, Bernstein anticipated an inspection by the Department of Health sometime in April. During this time period, Snelling overheard a conversation between Bernstein and Mike DeJaeger, a BMET III,[2] in which DeJaeger commented how "short-staffed" and "screwed" the clinical engineering department was going to be in light of Snelling's scheduled medical leave and the impending annual inspection by the Board of Health.

---

by the BMET IIIs, such as installation projects and support projects, did not need to be documented since they fell outside of the four core tasks. Further, Clarian claims that it was difficult to document work on software because it is not attributable or attached to a particular piece of software. In response, Snelling states that employees can document their time in a "miscellaneous" category in jobs that fall outside of the four core tasks. [*See* DSF ¶¶ 54–57].

**2.** The position of BMET III had supervisory authority of a BMET II such as Snelling, since they assigned work to them, and also provided input into the decision to terminate Snelling's employment. [DRSOMF ¶¶ 13, 16].

[Snelling Dep., p. 243]. In addition, the week before Snelling took his leave, he overheard DeJaeger and a fellow BMET III, Danny Godlove, engage in a conversation, the substance of which was "Maybe we will get lucky and be able to get rid of [Snelling] while he's gone." [Snelling Dep., p. 237].

Snelling was assigned certain work at the Family Practice Center, serving as the center's clinical engineer. In December, Bernstein e-mailed Mary Jane Hall, Family Practice's manager, and told her that all PMs would be current by the end of the year. On January 2, 2000, Snelling e-mailed Hall and informed her that the greatest portion of the PMs had been completed. [Pl.Ex. 18]. Due to the volume of work, Snelling was unable to complete the remaining tasks by the self-imposed deadline of January 5, 2000.

Throughout the months of January and February, Hall sent Snelling e-mails requesting that certain work be completed at Family Practice. Snelling responded to a February 11 e-mail from Hall stating that he would come in the following day to make the necessary repairs. However, Snelling was forced to take paid time off (PTO) because he and his child contracted the flu. When Snelling did not respond to a series of Hall's e-mails because of his absence, on February 22, 2000, Hall sent an e-mail to Bernstein complaining about the "lack of response and service" provided by Snelling. [Pl.Ex. 42]. However, incoming requests for inspections were impossible to complete due to the volume of work. On February 26, the last day of work before his leave, Snelling came to work on a Saturday to complete a list of

tasks he received from Bernstein, including the repair of two microscopes. Before going on leave, Snelling sent an e-mail to Bernstein and DeJaeger setting forth a detailed list of jobs that were left completed.

Clarian states that on February 24, Snelling told Bernstein that he had completed five of the seven repairs requested by Hall. Bernstein responded by saying "That's good, because if you hadn't done that, I would have terminated you." [Bernstein Dep., p. 225]. Snelling's account of this conversation is different. He states he never told Bernstein that he completed the work, but rather that he "addressed" the repairs, and denies Bernstein threatened him with termination. [Snelling Dep., p. 161].

Subsequent to Snelling's leave, on February 29, Bernstein received a forwarded e-mail from DeJaeger in which Hall informed that all of the seven requests for repair at Family Practice were not completed. [Pl. Exs. 30, 53]. In response, on March 2, Bernstein ran a closed work order report from the time period of January 27 to February 25. Except for a February 24 meeting with Hall, the report reflected no entries for Family Practice.[3] As a result, Bernstein reached the conclusion that Snelling lied about the work that he said he completed before his leave. As a result, by March 28, Bernstein states he had already decided to terminate Snelling's employment.

Snelling was scheduled to return to work from his medical leave on April 4. However, because of his scheduled vaca-

---

**3.** However, the report did not include work performed by Snelling from January 1 through 19, where he completed 123 PMs and 23 repair jobs, and for February 26, where he logged six hours of work and seven PM jobs, all at Family Practice. At Bernstein's deposition, Clarian agreed to generate a report of Snelling's work activity from January 1 through 30. The report revealed that Snelling completed 125 PMs and 23 repair jobs. During that time period, Snelling documented 105.90 service hours, with all but one of the jobs performed for Family Practice. [Snelling Affid., ¶ 24, Ex. A].

tion day, Bernstein requested that Snelling report to work the next day, April 5. Upon his arrival, Snelling was terminated for the stated reason that he failed to provide appropriate customer service and support, poor performance, failure to meet performance goals, and misrepresentation regarding work accomplished. [Pl.Ex. 53].

## II. Discussion

### A. Standard for Summary Judgment

■ A grant of summary judgment is appropriate if the pleadings, affidavits, and other supporting materials leave no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). To determine whether any genuine fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. *First Bank & Trust v. Firstar Information Services, Corp.*, 276 F.3d 317, 321–22 (7th Cir.2001). Thus, in ruling on a summary judgment motion, the district court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Oest v. Ill. Dep't of Corrections*, 240 F.3d 605, 610 (7th Cir.2001), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ There is no special version of Rule 56 that applies to employment discrimination cases. *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997). However, the Court applies the summary judgment standard with "particular care" in employment discrimination cases since intent and credibility are crucial issues. *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir.1998); *Alexander v. Wisconsin Dept. of Health and Family Services*, 263 F.3d 673, 681 (7th

Cir.2001). The Court must view the evidence making all reasonable inferences in favor of the non-moving party, and is not permitted to conduct a paper trial on the merits of the claim. *Anderson*, 477 U.S. 242, 250, 106 S.Ct. 2505; *Albiero v. City of Kankakee*, 246 F.3d 927, 931 (7th Cir. 2001); *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir.2001).

### B. Family and Medical Leave Act Claims

■ The Family and Medical Leave Act establishes two categories of protections for eligible employees. First, the FMLA contains prescriptive protections that are expressed as substantive statutory rights (so called "entitlement claims"). *See King v. Preferred Tech. Group*, 166 F.3d 887, 891 (7th Cir.1999). These substantive rights under the Act provide eligible employees of a covered employer the right to take unpaid leave for a period of up to twelve work weeks in any twelve-month period for a serious health condition as defined by the Act. *Id.; See also* 29 U.S.C. § 2612. After the period of qualified leave expires, the employee is entitled to be reinstated to the former position or an equivalent one with the same benefits and terms of employment that existed prior to the exercise of the leave. *See Serio v. Jojo's Bakery Restaurant*, 102 F.Supp.2d 1044, 1050–51 (S.D.Ind.2000) (Barker, J.), *citing Haefling v. United Parcel Serv., Inc.*, 169 F.3d 494, 498 (7th Cir.1999). To ensure the availability of these guarantees, the FMLA declares it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided." *Thomas v. Pearle Vision, Inc.*, 251 F.3d 1132, 1139 (7th Cir.2001), *quoting* 29 U.S.C. § 2615(a)(1). An employee alleging a deprivation of these substantive rights must demonstrate by a preponderance of the evidence only the eligible employee's

entitlement to the disputed leave. In such cases, the intent of the employer is immaterial. *Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711, 713 (7th Cir.1997).

 The second category of protections that arise under the FMLA is the anti-discrimination component similar to Title VII, the ADA, and the ADEA. *See Serio*, 102 F.Supp.2d at 1051, *quoting Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 160 (1st Cir.1998) ("Such issues [brought under the FMLA] are analogous to those raised in cases involving other types of discrimination."). This category of protections does not create substantive rights but rather prohibits an employer from discriminating or retaliating against an employee who requests or takes medical leave pursuant to the statute. *Horwitz v. Board of Educ. of Avoca School Dist. No. 37*, 260 F.3d 602, 616–17 (7th Cir. 2001). In these claims, "[a]n employer is prohibited from discriminating against employees ... who have used FMLA leave." (29 C.F.R. § 825.220 ©). *See also* 29 U.S.C. § 2615(a)(2) (it is unlawful "for an employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful under this subchapter."). Nor may an employer use the taking of FMLA leave as a "negative factor" in employment decisions, such as hiring, firing, promotions, and disciplinary actions. *Snow v. HealthSouth Corp.*, 2001 WL 395124, *11 (S.D.Ind.2001) (McKinney, J.). Unlike a substantive right claim, in a "discrimination/retaliation claim" the intent of the employer is relevant, and the burden-shifting apparatus of *McDonnell Douglas* applies with full force. *See McDonnell Douglas Corp. v. Green*, 414 U.S. 811, 94 S.Ct. 31, 38 L.Ed.2d 46 (1973); *King*, 166 F.3d at 891.

In this case, Snelling asserts both an "entitlement" claim and a retaliation claim under the FMLA.

### 1. Entitlement Claim

 Unlike anti-discrimination statutes, the provisions of the FMLA primarily grant substantive rights to eligible employees, creating entitlements the employer must honor. *See Diaz v. Fort Wayne Foundry*, 131 F.3d 711, 712 (7th Cir.1997). The proper analysis in a discrimination case is "whether the employer treated one employee worse than another on account of [considerations] that a statute makes [illegal]." *Id.* By contrast, laws like the FMLA that set minimum standards for employment "may not defend by saying that it treated all employees identically." *Snow*, 2001 WL 395124, *11, *quoting Diaz*, 131 F.3d at 712.

 The right to leave under the FMLA is not absolute. An employee who requests or takes protected leave under the FMLA is not "entitled to any greater rights or benefits than he would be entitled to had he not requested or taken leave." *Johnson v. Olin Corp.*, 2000 WL 1468480, * 19 (S.D.Ind.2000) (Barker, J.), *citing Kariotis v. Navistar Intern. Transp. Corp.*, 131 F.3d 672, 680–81 (7th Cir.1997). Therefore, an employer is entitled to dismiss an employee for any lawful reason at any time, whether before, during, or after an employee requests or takes leave pursuant to the FMLA, as long as the employer does not discriminate or retaliate against the employee for requesting or taking such leave. *See* 29 C.F.R. § 825.216; *Johnson*, 2000 WL 1468480, * 19. *See also Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1018 (7th Cir.2000) (the employer may present evidence that the employee would not have been entitled to restoration absent the leave). The employee bears the burden of proof by a preponderance of the evidence of the right to the entitlement. *Kohls v. Beverly Enterprises Wisconsin, Inc.*, 259 F.3d 799, 804 (7th Cir.2001).

In this case, Snelling officially commenced his leave on February 28, 2000 and was scheduled to return to work on April 4, 2001. However, before his scheduled return, Snelling received an e-mail from Bernstein that stated:

I do not want you to begin work on Tuesday, April 4. I need to talk to you before you start work and I will be on vacation until Wednesday, April 5. I will meet with you in my office on the Methodist Campus at 8:00 A.M.

[Snelling Dep. Ex. 45]. When Snelling reported for work on April 5, he was terminated.

Clarian states that Snelling was restored to his employment on April 4 since he was compensated for that day. [Def.'s Br., p. 5]. In the alternative, Clarian argues that Snelling was not entitled to reinstatement because of his performance problems. *Id.* at 7–10.

As to Clarian's compensation argument, the evidence establishes that Snelling was not paid out of regular payroll funds for April 4 but from a special sick leave account available for personal or family/medical leave. [Snelling Affid., ¶ 34, Ex. E]. This failed attempt by Clarian to establish that Snelling was restored merely demonstrates it extended his medical leave an additional day until April 5, the day he was informed of his termination. To hold otherwise would allow employers to circumvent the FMLA by restoring an employee on one day and then terminating that employee the next day. In any event, there is evidence that Clarian planned to terminate Snelling's employment by March 28, days before his scheduled return and the actual termination date. The Court therefore rejects Clarian's position that Snelling was restored to his employment.

Clarian also cites several deficiencies in Snelling's employment to justify his termination. However, as discussed in greater detail below, the Court finds that a reason-able juror could find Clarian's reasons for terminating Snelling pretextual. Therefore, genuine issues of material fact exist as to whether Snelling was denied the entitlement of reinstatement upon his release to return to work, and the Magistrate Judge recommends that Clarian's motion for summary judgment on this claim be denied.

## 2. Retaliation Claim

In a case where an employee is alleging discrimination based on the FMLA, "[t]he issue becomes whether the employer's actions were motivated by an impermissible retaliatory or discriminatory animus." *Horwitz*, 260 F.3d at 616, *quoting King*, 166 F.3d at 891. Snelling has chosen to utilize the *McDonnell Douglas* burden-shifting framework to prove his retaliation claim. To prove a prima facie case of retaliatory discharge under the FMLA, Snelling must demonstrate that: (1) he engaged in a protected activity; (2) Clarian took an adverse employment action against him; and (3) there is a causal connection between his protected activity (medical leave) and the adverse employment action (his termination). *Watkins v. Henderson*, 2001 WL 219807, *18 (S.D.Ind. 2001) (Barker, J.), *citing King*, 166 F.3d at 892–93. Due to the timing of Snelling's protected leave, and that fact that he was terminated, Clarian does not dispute that Snelling establishes a prima facie case. [Def.'s Br., p. 8].

Since Snelling establishes a prima facie case, there is a presumption that discrimination (or retaliation) occurred, and Clarian must come forward with a legitimate, non-discriminatory reason for its decision to terminate. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Lenoir v. Roll Coater, Inc.*, 13 F.3d 1130, 1133 (7th Cir.1994). At this stage, Clarian "need only produce admissible evidence

which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 257, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ Once Clarian meets this burden of production, Snelling must prove by a preponderance of the evidence that the reason offered by Clarian for his termination is merely a pretext for discrimination because of taking his leave under the FMLA. *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089; *Plair v. E.J. Brach & Sons, Inc.,* 105 F.3d 343, 347 (7th Cir.1997); *Stockett v. Muncie Indiana Transit Sys.,* 221 F.3d 997, 1001–01 (7th Cir.2000). *See also McClendon v. Indiana Sugars, Inc.,* 108 F.3d 789, 797 (7th Cir.1997) ("Once an employer makes this showing [of a legitimate, non-discriminatory reason for the adverse employment action], the burden then shifts back to the employee to show that the employer's proffered reasons are pretextual and that its actual reason was discriminatory or retaliatory."); *Sweeney v. West,* 149 F.3d 550, 557 (7th Cir.1998) ("Establishing pretext requires more than excusing the employer's stated reason for its decision; the plaintiff must call the employer's honesty into question by rebutting the reason given . . . .").

■ For purposes of summary judgment, the Court assumes that Clarian meets its burden to show that it terminated Snelling for legitimate, non-discriminatory reasons. Therefore, the argument moves to the pretext stage. Snelling must demonstrate by a preponderance of the evidence that Clarian did not truly believe that he was performing his job inadequately, and that the real reason that he was fired was in retaliation for exercising his FMLA rights. In effect, there are two aspects to a successful showing of pretext. First, Snelling must prove by a preponderance of the evidence that the reasons prof-fered by Clarian for discharging him were not genuine, with the accompanying inference that some other unstated motive must explain the action. Then, he must prove by a preponderance of the evidence that it is more likely than not, based upon the facts in the record, that Clarian's unstated motive was to retaliate against him for taking a legitimate FMLA leave. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 148–49, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). *See also Gordon v. United Airlines, Inc.,* 246 F.3d 878, 888–89 (7th Cir.2001) ("To show pretext, [plaintiff] bears the burden of demonstrating that [defendant's] ostensible justification for its decision is unworthy of credence."); *Sanchez v. Henderson,* 188 F.3d 740, 746 (7th Cir.1999), *cert. denied,* 528 U.S. 1173, 120 S.Ct. 1201, 145 L.Ed.2d 1104 (2000) (stating that a plaintiff can show pretext "by showing that the employer's proffered reason was not worthy of belief").

■ Clarian claims it terminated Snelling because he failed to provide appropriate customer service and support to Hall and others, input from BMET IIIs regarding Snelling's performance, failure to meet performance goals, his past history of performance problems, documentation problems, and misrepresentation regarding work accomplished. [DSF ¶ 236; Bernstein Dep. Ex. 38]. In the alternative, Clarian invokes the "honest belief" defense. If Clarian honestly believed its reason for discharging Snelling, Snelling cannot meet his burden. *See Nawrot v. CPC International,* 277 F.3d 896, 905–06 (7th Cir.2002), *citing Jordan v. Summers,* 205 F.3d 337, 343 (7th Cir.2000). This is true even if Clarian's reasons for terminating Snelling were "foolish or trivial or even baseless" as long as Clarian honestly believed its reasons. *Brill v. Lante Corp.,* 119 F.3d 1266, 1270 (7th Cir.1997).

In this case, in viewing the facts in a light most favorable to Snelling, the record reveals disparities in application of Clarian's disciplinary process, suspicious timing in Snelling's termination, remarks by decisionmakers regarding Snelling's impending medical leave, and credibility issues, all of which call into question Clarian's proffered justifications. Therefore, summary judgment is inappropriate in this case.

### 1. Failure to Meet Performance Targets

Clarian states it terminated Snelling, in part, for his failure to meet performance goals and/or problems in documenting his work. In 1999, a series of meeting were held between Bernstein and BMETs in which Bernstein said he wanted his employees to document all their work, even the time they attended meetings. In addition, Bernstein stated he wanted the BMETs to maintain a 70% documentation level for all work performed of any kind (*i.e.* that at least 70% of time spent at work should be accounted for on work orders and recorded in the Clarian's database). One way to gauge the productivity of BMET Is and IIs was to compare the time documented on work orders with the time spent at work.

In order to demonstrate that Clarian's reasons for termination for pretextual, Snelling submits statistical evidence to show his co-workers also failed to meet the 70% goal set by Bernstein. *See Bell v. E.P.A.* 232 F.3d 546, 553 (7th Cir.2000), *citing McDonnell Douglas*, 411 U.S. at 804–05, 93 S.Ct. 1817 ("statistics as to [the company's] employment policy and practice may be helpful to a determination of whether [the complained of action] conformed to a general pattern of discrimination" and are relevant evidence of pretext); *Guerrero v. Ashcroft*, 253 F.3d 309, 315–16 (7th Cir.2001) ("We have found statistical evidence to be admissible and helpful in disparate treatment cases . . . .").

The summary report for the year 1999 reflects that BMET IIs Dennis Weber and Dale Witsman ranked lower than Snelling on PMs and repairs but did not receive written disciplinary action or suffer termination of employment like Snelling. [Bernstein Dep. Ex. 53]. In 1999, Bernstein conducted a series of employment evaluations. On February 3, 2000, Snelling received an employment evaluation that stated he had only documented 27% of his time on the clock for PMs and repairs. [Bernstein Dep., Ex. 36]. However, according to Snelling's "employee termination" paperwork, through the time period of January 2 to February 26, Snelling had documented 69% of his work time. [Bernstein Dep. Ex. 38]. The evaluations of his fellow co-workers during a similar time period reveal that Snelling's fellow co-workers performed worse and/or failed to meet the 70% goal set by Bernstein. For instance:

- On February 3, 2000, the same day Snelling received his evaluation, BMET II Weber received an employment evaluation that noted he only documented 9% of his work time on PMs and repairs. [Bernstein Dep. Ex. 58]. He also had the lowest percentage of PMs, unwanted situations, and red tags. *Id.* at Exs. 65–66. Weber also had the lowest overall percentage of documentation on core business. *Id.* at Exs. 66–67. Additionally, Bernstein had previously mentioned Weber's documentation problems in earlier evaluations.

- On March 1, 2000, BMET II Witsman received an employment evaluation that noted he only documented 9% of his work time on PMs and repairs "because of Y2K." However, he received a "competent" rating. [Bernstein Dep. Ex. 65].

- On February 23, 2000, BMET II Mark Bradsaw received an employment evaluation that showed he only documented 64% of his work time on PMs and repairs. However, he was rated as competent. [Bernstein Dep. Ex. 59].
- On January 29, 2000, BMET II Eric Carlisle documented 62% of his work time on the clock performing core tasks but received a rating of "competent." [Bernstein Dep. Ex. 60]
- On February 2, 2000, BMET II Michael Cook received a competent rating on his employment evaluation even though it showed he had only documented 65% of his work time on PMs and repairs. [Bernstein Dep. Ex. 61]
- On June 8, 2000, BMET II Dave Mecker received an employment evaluation that demonstrated he had only documented 48% of his work time on core responsibilities for the year 1999. The evaluation also noted that he performed the fewest number of repairs in the department. However, the evaluation rated him as competent. His previous evaluations also noted problems documenting his work. [Bernstein Dep. Ex. 62].
- On February 29, 2000, BMET Brian Reed received an employment evaluation that reflected he had documented only 55% of his work time on PMs and repairs. However, he received a "competent" rating. [Bernstein Dep. Ex. 63].
- On February 2, 2000, BMET Paul Shrout received an employment evaluation that showed he only documented 59% of his time on PMs and repairs. However, he received a competent rating. [Bernstein Dep. Ex. 64].

In 1999, Snelling also documented more hours than fellow employees on Closed Work Orders. On the Closed Work Orders, Snelling documented 621.16 hours, as opposed to Weber, who logged 399.05 hours, and Witsman, who logged 609.77. This disparity continued in the first two months of 2000. During that time period, Snelling logged 208.9 hours worked on Closed Work Orders, as opposed to Witsman, who documented 143 hours. [Snelling Affid., Ex. C].

In addition, a report on Clinical Engineering from January 1 through February 26 demonstrates that Snelling's productivity at 69% was higher than BMETs Carlisle, Weber, Williams, Cook, Pittman, and Witsman. Subsequent reports from February 27 to June 17 also show several employees below 69%. [*See* Bernstein Dep. Ex. 54].

Further, Snelling demonstrates that he had a higher number of PMs and repairs jobs completed than several other BMET II. For instance, in 1999 Snelling completed 333 PMs and repair jobs. During the same time period, Weber accomplished 124 jobs, and Witman 212 jobs.

Finally, Snelling also accumulated more work hours than Weber and Witsman during the months of January and February of 2000. During this time period, Snelling documented 204.9 hours worked out of 295.37 hours paid. Comparatively, Weber documented 85 hours worked out of 327.42 hours paid, and Witsman documented 85 hours worked out of 233.6 hours paid. [Bernstein Dep. Ex. 54].

Clarian states many of the low percentage figures exhibited by other BMET IIs can be explained because some of these workers performed work outside of the four core tasks, thus it was not necessary to document that time. [*See* DSF ¶¶ 54–57]. However, this position goes against Bernstein's instructions to BMETs in 1999 to document all their work so he could justify the existence of the clinical engineering department. In any event, worked performed outside of the core

tasks could be documented under the "miscellaneous" category.

While the Seventh Circuit has warned repeatedly that courts should not sit as a superpersonnel department that second guesses an employer's business decisions, the Court "need not abandon good reason and common sense in assessing an employer's actions," or "even take an employer at its word." *Gordon,* 246 F.3d at 888–89; *Stewart v. Henderson,* 207 F.3d 374, 378 (7th Cir.2000). Snelling's use of statistical and comparative evidence of other BMETs who either failed to meet the 70% threshold or received lower percentages creates a genuine issue of material fact as to whether Snelling was retaliated against for exercising his statutory rights to leave. *See Imhoff v. KMart Stores of Indiana, Inc.,* 149 F.Supp.2d 559, 569–70 (N.D.Ind.2001) ("Plaintiff's statistical evidence combined with the surrounding facts and circumstances, are sufficient to allow a reasonable juror to conclude that the Defendants proffered reasons for their [adverse employment action] were a pretext to cover up the real reason [discrimination].").

### 2. Comments by Decisionmakers

Snelling also presents comments by decisionmakers regarding his impending medical leave that could lead a reasonable juror to conclude that he was retaliated against. For instance, after announcing his impending medical leave, Snelling overheard Bernstein and BMET III Mike De-Daegar talking about how "short staffed" and "screwed" the department was going to be in the month of March because of the scheduled Board of Health's visit and Snelling's absence. [Snelling Dep., p. 243]. As a BMET III, it is undisputed that DeJaegar was a decisionmaker in Snelling's termination. *Id.* at 106–108.

One week before Snelling's scheduled leave in late February, Snelling overheard another conversation between DeJaeger and another BMET III, Denny Godlove. The gist of that conversation was "Maybe we will get lucky and be able to get rid of him while he's gone." *Id.* at 236–37. Similar to DeJaeger, Godlove was also a decisionmaker in Snelling's termination. *Id.* at 106–108.

DeJaeger's remarks proved to be prophetic since Clarian did get rid of Snelling. The Court finds these statements to be both proximate in time to the decision to terminate and related to Snelling's medical leave. When statements similar to these are made contemporaneously to a firing and uttered by a decisionmaker, courts have found that such evidence establishes a discriminatory intent. *See, e.g., Geier v. Medtronic,* 99 F.3d 238, 242 (7th Cir.1996) (in order for isolated, derogatory statements to qualify as proof of discriminatory intent to support a claim of disparate treatment, the remarks must have been made concurrently with the discharge or causally related to the decision making process); *Venters v. City of Delphi,* 123 F.3d 956, 973 (7th Cir.1997) (reversing summary judgment for employer; "remarks and other evidence that reflect a propensity by the decision maker to evaluate employees based on illegal criteria will suffice as direct evidence of discrimination even if the evidence stops short of a virtual admission of illegality."); *Walker v. Glickman,* 241 F.3d 884, 888 (7th Cir.2001) (same); *Gorence v. Eagle Food Centers, Inc.,* 242 F.3d 759, 762 (7th Cir.2001) (statements of a derogatory character are evidence of discrimination only if they are made around the time of and in reference to the alleged adverse employment action).

### 3. Credibility Issues

Clarian proffers another reason for Snelling's termination in that he allegedly misrepresented work he completed at Family Practice, and that this discovery

"confirmed critical shortcomings during [his] FMLA absence." [Def.'s Br., p. 10]. However, summary judgment is precluded for an additional reason because of issues surrounding Bernstein's credibility.

 The Seventh Circuit has repeatedly held that it will not resolve credibility issues at the summary judgment stage. Therefore, "[i]f the employee offers specific evidence from which the finder of fact may reasonably infer that the proffered reasons do not represent the truth, the case then turns on the credibility of the witnesses." *Collier v. Budd Co.*, 66 F.3d 886, 893 (7th Cir.1995). In such circumstances, the employee creates "a factual issue as to whether the employer's explanation is credible or merely a pretext for discrimination." *Dey v. Colt Const. & Development Co.*, 28 F.3d 1446, 1461 (7th Cir.1994). *See also Malacara v. City of Madison*, 224 F.3d 727, 734 (7th Cir.2000), *quoting McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 372 (7th Cir.1992) ("This court has held that plaintiffs may establish pretext by 'simply attack[ing]' the credibility of the employer's proffered reason for termination.").

Throughout late 1999 and prior to his medical leave, Snelling was assigned a series of duties at Family Practice that went uncompleted. On February 24, 2000, Bernstein directed Snelling to complete the repairs and PMs. [Snelling Dep. Ex. 53]. When Bernstein inquired into the status of the work, Snelling stated he had "addressed" the repairs. [Snelling Dep., p. 161].

On February 26, Snelling documented 6 hours of work, including the completion of 7 PMs at Family Practice. Subsequent to Snelling's leave on March 2, 2000, Bernstein ran a report showing work orders completed by Snelling from January 27 to February 25. The report did not include the work performed on February 26, making it appear that Snelling ignored Family Practice's work requests.

On March 24, 2000, Bernstein ran another report, this time tracking Snelling's work activity from January 19 to February 19, and not his work activity from January 1 to January 18. Again, this had a negative impact on Snelling's work statistics. After Bernstein's deposition, a report was produced that demonstrated from January 1 to January 30, Snelling completed 123 PMs, 23 repair jobs, and logged 105.90 service hours. All but one of these jobs was done at Family Practice. [Snelling Affid. ¶ 24, Ex. A]. After a review of the record, drawing all inferences in Snelling's favor, a reasonable juror could conclude that Bernstein intentionally provided an incomplete and inaccurate picture of Snelling's work to justify termination, thus thrusting Bernstein's credibility into issue.

There are other instances that cast Bernstein's credibility into question. For instance, on January 19, 2000, Snelling received a CA that set certain expectations for improvement. [Snelling Dep. Ex. 19]. Snelling complained to Bernstein about these expectations, stating they were a "mathematical impossibility" to complete. [Snelling Dep., pp. 126–27]. Bernstein acknowledged that it was "probably not" possible for Snelling to meet these performance expectations. [Bernstein Dep., p. 100]. At the time Bernstein handed down the January 2000 corrective action, he knew Snelling's medical leave was imminent. Courts have recognized that pretext can be proven by showing that a supervisor set an employee up to fail. *See, e.g., Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir.1990); *Watson v. Norton*, 10 Fed. Appx. 669, 2001 WL 290081, * 9 (10th Cir.2001); *Serrano–Cruz v. DFI Puerto Rico, Inc.*, 109 F.3d 23, 26 (1st Cir.1997); *Stacks v. Southwestern Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1325–26 (8th Cir.1994).

Again, a reasonable juror could conclude that Bernstein set these unreasonable performance goals to support Clarian's termination decision because of Snelling's impending medical leave.

As stated previously, Clarian states that it reinstated Snelling's employment on April 4 since he was compensated for that day, and that he was not terminated until April 5 when he reported back to work from his medical leave. [Def.'s Br., pp. 4–7]. However, Bernstein testified that as a result of his investigation into Snelling's alleged misrepresentations regarding the work he performed at Family Practice, by March 28 he had already concluded that Snelling's employment would be terminated. [Bernstein Dep., p. 229]. These conflicting accounts about when Snelling's employment was actually terminated casts yet another shadow into the credibility of Bernstein, and constitutes further evidence as to the honesty of Clarian's belief in its decision to terminate. *See Stalter v. Wal-Mart Stores, Inc.,* 195 F.3d 285, 291 (7th Cir.1999) (changed or inconsistent stories may constitute evidence of pretext); *Hasham v. California St. Bd. of Equalz'n,* 200 F.3d 1035, 1047 (7th Cir.2000) (court recognizes that an employee may sometimes avoid summary judgment by showing that the employer has articulated non-discriminatory reasons in such an inconsistent manner that a jury could find that the employer is dissembling).

#### 4. Timing of Snelling's Leave

Clarian states that Snelling cannot establish a "temporal link" between Snelling's discipline and his FMLA leave. [Def.'s Br., p. 8]. "In some cases, suspicious timing may suggest a causal link between protected expression and adverse action." *Hunt–Golliday v. Metropolitan Water Reclamation District of Greater Chicago,* 104 F.3d 1004, 1014 (7th Cir. 1997). Snelling presents evidence in which a reasonable juror could conclude that his medical leave was inconvenient to Clarian, and thus a negative factor in its decision to terminate.

The timing of Snelling's leave resembles the leave taken by the plaintiff in *Routes v. Henderson,* 58 F.Supp.2d 959 (S.D.Ind. 1999). The plaintiff in *Routes* was a post office clerk who exercised his right to leave during the month of December, the Postal Service's busiest time of the year. Routes' supervisor was upset because he considered his leave as treatment for "elective medical care." *Id.* at 965. Therefore, Routes claimed that the Postal Service interfered with his rights under the FMLA by failing to reinstate him to his employment, and that it did so in retaliation for his having taken FMLA-qualifying leave. *Id.* at 979. In finding the Postal Service violated the FMLA, Judge McKinney observed:

[Routes' supervisor] had a negative, if understandable, reaction to Routes taking sick leave in December of 1994, when the small post office could least afford to be short-handed. That reaction, however, is prohibited by the FMLA from coloring or otherwise affecting any subsequent decisions [the supervisor] made about handling this employee or dealing with his continuing medical problems. From the evidence presented, the Court finds that [the supervisor] did allow his negative reaction to affect his subsequent conduct. Whether [the supervisor] felt that Routes was an employee whose absenteeism was not good for the post office as a whole, or he just developed a negative filter through which to process all incoming information about Routes, it created a subjective reality in which Routes' past conduct and present condition were interpreted in the most negative light. Even if [the supervisor's] reaction is understandable, it is the

Court's view that his conduct is inconsistent with the FMLA

*Id.* at 981–82.

 In the case at bar, according to DeJaeger's statements, the timing of Snelling's leave left the clinical engineering department "short staffed" in the month of March. In addition, during the period of Snelling's leave, the department was in the midst of a particularly busy time in light of the annual Board of Health's inspection scheduled for April. [Bernstein Dep., pp. 28, 138]. The timing of Snelling's leave, coupled with the statements of DeJaeger, leave the impression that Clarian perceived the timing of Snelling's FMLA leave as inconvenient. "[U]nder certain circumstances timing alone may create an inference of retaliation." *Johnson v. Cambridge Industries, Inc.*, 2001 WL 1691489, *7 (S.D.Ind.2001) (Barker, J.), *citing Horwitz v. Board of Educ. of Avoca School Dist. No., 37*, 260 F.3d 602, 612–13 (7th Cir.2001), and *Silk v. City of Chicago*, 194 F.3d 788, 800–01 (7th Cir.1999). *See also Kohls*, 259 F.3d at 805–06 ("[w]e can imagine circumstances in which the timing of [the decision to terminate] could lead a fact finder to infer that the employee would not have been fired absent her taking of leave (if, for example, a supervisor who had been aware of problems with an employee did not decide to fire the employee until she took leave, and the supervisor based the firing on the incidents of which the employer had already been aware)").

In summary, Snelling has created a mosaic of evidence that, if taken together, casts doubt as to Clarian's true motivation for terminating Snelling's employment. As a result, Clarian's motion for summary judgment should be denied.

### III. Conclusion

Snelling has created genuine issues of material fact as to whether Clarian failed to restore his employment and terminated him in retaliation for exercising his right to leave. Therefore, the Magistrate Judge recommends that Clarian's motion for summary judgment be DENIED.

So ordered.